1

**NICHOLAS & TOMASEVIC, LLP**
Craig M. Nicholas (SBN 178444)

2
Shaun Markley (SBN 291785)
Jordan Belcastro (SBN 339570)

3
225 Broadway, 19th Floor
San Diego, California 92101

4
Tel: (619) 325-0492
Fax: (619) 325-0496

5
Email: cnicholas@nicholaslaw.org
Email: smarkley@nicholaslaw.org

6
Email: jbelcastro@nicholaslaw.org

7
Attorneys for Plaintiff,
THE UPPER DECK COMPANY

8

9

**UNITED STATES DISTRICT COURT**

10

**SOUTHERN DISTRICT OF CALIFORNIA**

11

| THE UPPER DECK COMPANY, a Nevada corporation, | Case No. 3:23-cv-01249-L-BLM |
|---|---|
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | **(1) BREACH OF CONTRACT;** |
| RYAN MILTON (a/k/a RYAN MILLER), an individual; RAVENSBURGER NORTH AMERICA, INC., a Washington corporation, | **(2) BREACH OF FIDUCIARY DUTY;** |
| | **(3) FRAUD [CAL. CIV. CODE § 1710(3)];** |
| Defendants. | **(4) INDUCING BREACH OF A WRITTEN CONTRACT;** |
| | **(5) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** |
| | **(6) COPYRIGHT INFRINGEMENT;** |
| | **(7) CONVERSION; AND** |
| | **(8) UNFAIR BUSINESS PRACTICES [BUS. & PROF. CODE, § 17200 ET SEQ.].** |
| | **DEMAND FOR JURY TRIAL** |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

FIRST AMENDED COMPLAINT

Plaintiff, The Upper Deck Company ("Upper Deck"), complains and alleges against Defendants Ryan Milton, a/k/a Ryan Miller ("Miller") and Ravensburger North America, Inc. ("Ravensburger") (collectively referenced henceforth as "Defendants"), and alleges on information and belief as follows:

## INTRODUCTION

1.    Upper Deck seeks to protect its intellectual property from premeditated theft by Miller. On a work for hire basis, Upper Deck engaged Miller as lead game designer to develop a major proprietary trading card game for Upper Deck called "Rush of Ikorr."  After over a year of developing Rush of Ikorr alongside Upper Deck, Miller terminated his contract with Upper Deck and, either before termination or just after, began working for Defendant Ravensburger, a direct competitor. At Ravensburger, Miller transported his work product on Rush of Ikorr, knowing such work product was owned solely by Upper Deck, into a trading card game called "Disney Lorcana" ("Lorcana"). This trading card has remarkable, uncanny similarities to Upper Deck's Rush of Ikorr.

2.    Miller's acts in pilfering the game design Upper Deck paid him to create and using those designs to develop a competing trading card game for a competitor were aided and encouraged by Ravensburger, who now seeks to profit from the stolen intellectual property.  These acts give rise to a host of causes of action under California and federal law.

## JURISDICTION & VENUE

3.    Defendants removed this case to federal court based on diversity jurisdiction. *See* ECF No. 1. The Court also has federal question jurisdiction in light of the Copyright claim set forth below.

4.     This Court has personal jurisdiction over Miller. Miller performed services for Upper Deck, a San Diego-based company. As it relates to contract claims, he signed and breached two contracts with Upper Deck, both of which contained California choice-of-law and San Diego dispute resolution venue provisions. In

performance of the services under the contracts, Miller traveled to San Diego County, including to the 2018 Gaming Summit at Upper Deck's office where Miller and other contracted game designers, in addition to Upper Deck personnel and senior management, brainstormed, conceived, and invented the game concept that became Rush of Ikorr.  Miller also made a 2019 trip to Upper Deck's headquarters in Carlsbad, CA to test play the working version of the game and to continue to meet with Upper Deck's in-house development team to bring the product to market.

5.    In completing his work under the contracts, even while out of state, Miller routinely communicated with and directed his activities towards Upper Deck's California-based employees on their in-house, gaming team located in Carlsbad. Miller's obligations under the contracts expressly survive termination and create ongoing obligations to Upper Deck with enforcement to occur here.

6.    Additionally, under the Sumit Agreement and Work For Hire Agreement (defined and discussed below), Miller and Upper Deck agreed that any disputes would be resolved in San Diego, CA. This means Miller has consented to jurisdiction here in San Diego. The contracts also have a choice of law provision saying California law will apply. Thus, Miller received the benefits and protections of California law through his contractual relationships with Upper Deck. Miller's actions establish consent to jurisdiction and sufficient minimum contacts with the state of California, making it fair and reasonable for Miller to be held accountable in this Court.

7.    Furthermore, Miller routinely works for or with California companies to design games for them. California game publishers such as Microsoft, Bandai Namco, Ultra Pro, Alderac Entertainment Group, Shinobi 7, and Osprey Publishing have all retained Miller to develop games for them and, on information and belief, Miller has consented to jurisdiction in California law relating to those works and has taken advantage of substantive California law in entering contracts with these California companies. It is readily foreseeable Miller would need to answer claims relating to his work as a game designer here.

8.    This Court also has personal jurisdiction over Defendant Ravensburger. On information and belief, Ravensburger has acted in concert with Miller during much of the time relevant to this Complaint, resulting in a breach of Miller's California contracts. Ravensburger, through reasonable due diligence and conflict checking practices surely became aware of Miller's contacts with Upper Deck, among other companies based in California. Ravensburger therefore knew of Miller's obligations under the California contracts which called for application of California law and venue in San Diego.

9.    Ravensburger's trading card game at the center of this Complaint, "Disney Lorcana," is a Disney-licensed product. Disney is a California company headquartered here. Ravensburger has a long history of partnering with this California company creating many Disney products over the years including puzzles and board games.

10.    Consistent with its longstanding Disney partnership, Ravensburger decided to announce the launch of Lorcana at the "D23" annual Disney convention in Anaheim, California. Miller attended the event and sat at the Lorcana booth. They offered special Lorcana game promotions, giveaways, and releases to attendees at the California event, many of them California residents. These promotional activities, product giveaways, and other activities violated Upper Deck's rights as explained below.

11.    Ravensburger has made pre-sales and actual sales of Lorcana and will soon make deliveries of these products to California consumers including those in County of San Diego. In addition, the first live sales of the Lorcana products will occur *exclusively* at Disney locations such as Disneyland in Anaheim, California. Mass retail sales in other states will follow. California visitors and residents are the early, prime target audience for the product.

12.    The Disney Lorcana name is also a registered trademark. It is registered to Disney Enterprises, Inc. with a California address.

13.     More generally, Ravensburger has made a host of products for California companies over the years. It is a frequent licensing partner of Disney, making gaming products in connection with brands like Pixar, Marvel, and Lucas Films. It also frequently creates gaming products for companies like Warner Brothers, maker of DC Comics, Harry Potter, Looney Toons, and Wizard of Oz. The same is true for Universal Pictures, maker of Jurassic Park, Minions, and Jaws. It also partners and makes products in collaboration with Microsoft for games including Minecraft. On information and belief, many of these contracts call for resolution of disputes relating to Ravensburger's games to be resolved in California and/or call for the application of California law.

14.     Since at least 2013, Ravensburger (f/k/a Wonder Forge, Inc.) has registered to do business in California and has an agent for service of process in Sacramento.

15.     As such, Ravensburger has sufficient minimum contacts to make it fair and reasonable for Ravensburger to be held accountable in a California court.

16.     Upper Deck is also seeking further jurisdictional discovery from Defendants relating to things like their prior contracts with California companies, their level of travel to and business conducted in California, their maintaining of personnel or offices in this state, and their specific promotional and sales activities relating to the knock-off Lorcana product in this state. Upper Deck asks the Court not to rule on jurisdiction until Upper Deck has had the opportunity to further explore jurisdiction and make further allegations based upon its findings.

17.     Venue is proper in this judicial district. The relevant contracts were all executed in California and call for a California (San Diego) venue and applicable law. Upper Deck's principal place of business is in San Diego County, and Defendants conduct and/or have conducted business within San Diego County relevant to this action as explained above.

**PARTIES**

18.    Plaintiff The Upper Deck Company is, and at all relevant times was, a corporation organized and existing under and by virtue the laws of the State of Nevada. Upper Deck is authorized to conduct business in California and has its principal place of business at 5830 El Camino Real, Carlsbad, California 92008. Upper Deck is a worldwide sports and entertainment company that, for decades, has created valuable and innovative entertainment products.

19.    Defendant Miller is an individual formerly contracted by Upper Deck to collaborate and further develop its Rush of Ikorr trading card game. He is a current employee of Ravensburger. Upon information and belief, Miller resides in Seattle, Washington.

20.    Defendant Ravensburger North America, Inc. is a Washington corporation with a principal business address at 915 E. Pine Street, Suite 400, Seattle, Washington 98122. Ravensburger is a game and toy company and is a direct competitor to Upper Deck.

**GENERAL ALLEGATIONS**

**A.    The Parties' Relevant Experience with Trading Card Games**

21.    Upper Deck is a leading manufacturer of, among other products, sports and entertainment trading cards and trading card games. Upper Deck has developed and successfully sold a multitude of novel and innovative trading card games (sometimes called "TCG"), which include, but are not limited to: Vs. System® 2PCG®; World of Warcraft Trading Card Game; Yu-Gi-Oh!; Super Hero Squad; QuickStrike; and Winx Club.

22.    Rush of Ikorr is Upper Deck's latest, still-in-progress creation in this long line of successful and popular products.

23.    For decades, Miller has worked in the entertainment and gaming industries, mostly serving as a freelance, work made-for-hire game designer. Prior to Rush of Ikorr, he helped design several of Upper Deck's games. On information and

belief, Miller has worked for other companies to design various other types of strategy games like Magic: The Gathering; Duel Masters and Kaijudo; and Digimon.

24.    Ravensburger is an entertainment company that focuses on toys, including games. While Ravensburger has made many strategy games over the years, on information and belief, trading card games are not something it normally makes or has made in the past.

**B.    The 2018 Upper Deck Gaming Summit Leading to Rush of Ikorr**

25.    Looking to make its next hit TCG, Upper Deck held a Gaming Summit from December 15 through December 16, 2018. Upper Deck invited and paid expenses for several game designers, including Miller, to visit Upper Deck's Carlsbad office with the specific purpose of aiding Upper Deck in the creation, brainstorm, and collaboration of a new and novel TCG.

26.    Like the other game designers who accepted their invitation to the Gaming Summit, Miller entered into a 2018 Upper Deck Gaming Summit Agreement ("Summit Agreement"). In exchange for the compensation he would receive, the Summit Agreement called for Miller to contribute ideas and feedback relating to the design and creation of new games and game mechanics that Upper Deck would own and hold all rights to use. The Summit Agreement also contained confidentiality and work for hire clauses requiring Miller to keep private anything shared at the Summit and acknowledge that works and concepts created as a result of or in connection with the Summit belonged exclusively to Upper Deck.

27.    Upper Deck invested substantial resources, monetary and otherwise, in its Gaming Summit to best incubate the seeds of a highly innovative and marketable TCG.

28.    At the Gaming Summit, Miller, among other game designers, and Upper Deck personnel and senior management discussed, conceived, and created what would become the trading card game currently called "Rush of Ikorr."  Upper Deck subsequently offered Miller the role as lead game designer in 2019.

### C.    Upper Deck and Miller's Development of Rush of Ikorr

29.    Miller's role as lead game designer was memorialized via a Work For Hire Agreement dated June 24, 2019 ("Work For Hire Agreement"). Per the Work For Hire Agreement, Upper Deck agreed to pay Miller to create and design a TCG that could be played both in physical and digital form. Miller was responsible to create the initial theme of Rush of Ikorr (formerly known as Shell Beach), develop basic game mechanics, provide a single player demonstration deck with between 20-30 cards to convey the game's design, and to "use his best efforts to contribute ideas, concepts, designs, and feedback related to the design, mechanics, and creation of the [Rush of Ikorr TCG] commensurate with UDC's brand."

30.    The Work For Hire Agreement set out a timeline running from June 2019 through March 2021 under which Miller would complete various milestones and expansions of Rush of Ikorr.

31.    As with the Summit Agreement, the Work For Hire Agreement provided that all of the products, works, concepts, trade secrets, and intellectual property developed by Upper Deck and Miller to create Rush of Ikorr belonged solely to Upper Deck. As such, the parties agreed that Rush of Ikorr and related and underlying materials were works made for hire belonging to Upper Deck and were irrevocably assigned by Miller to Upper Deck including all modifications and derivatives thereof.

32.    Under the Work For Hire Agreement, Miller also agreed to keep confidential any information he received in carrying out and performing work on Rush of Ikorr. This obligation continued even after termination or satisfaction of the contract.

33.    Following the parties' execution of the Work For Hire Agreement, the detailed development of Rush of Ikorr commenced. As lead game designer, Miller was tasked with creating Rush of Ikorr's rules, card designs, game mechanics, and win conditions. Pursuant to the Work For Hire Agreement, Miller received feedback

from Upper Deck at the completion of each Milestone and then implemented that feedback.

34.    Ultimately, Miller completed Milestones 1 through 5, per the Work For Hire Agreement for Rush of Ikorr, and Upper Deck paid him tens of thousands of dollars for his services.

35.    On or about October 21, 2020, Miller informed Upper Deck that he was terminating the Work For Hire Agreement.

36.    Throughout Miller's time as lead game designer of Rush of Ikorr, Miller had direct access to Upper Deck's confidential, proprietary information, including, without limitation, Rush of Ikorr draft rules, concepts, components, designs, marketing strategies, and plans for implementation. On information and belief, Miller maintained access to these things even after terminating his relationship with Upper Deck and used, referenced, and/or otherwise relied on them to create Lorcana for Ravensburger.

**D.    Miller Goes to Work for a Competitor, Ravensburger**

37.    Either before or just after Miller terminated the Work for Hire Agreement, he began to work with Ravensburger.  After Miller began consulting with Upper Deck on Rush of Ikorr pursuant to his agreements with Upper Deck, upon information and belief, Miller began discussing potential work for and/or employment by Ravensburger, although he concealed this fact from Upper Deck.

**E.    Upper Deck Continues to Develop Rush of Ikorr**

38.    Despite Miller's departure, Upper Deck continued to invest in the Rush of Ikorr game design by dedicating substantial time and resources to further develop Rush of Ikorr; Miller's exit directly resulted in a significant time delay and interruption in the game development process, as well as increased costs incurred by Upper Deck. For example, Upper Deck hired two additional work-for-hire game designers to finish Rush of Ikorr under Upper Deck's direction and guidance.

39.    Upper Deck has not publicly announced or launched Rush of Ikorr.

40. In April 2023, Upper Deck filed a patent application for Rush of Ikorr.

**F.    Ravensburger Announces Lorcana**

41. Unbeknownst to Upper Deck, Ravensburger and Miller spent approximately 2.5 years developing Lorcana which Ravensburger first announced publicly in or around September of 2022. Ravensburger publicly named Miller the product manager and co-designer of the trading card game. In an interview at the time of the announcement, Miller acknowledged that, in creating the game, "[w]e're not trying to reinvent the wheel." https://www.thegamer.com/disney-lorcana-tcg-ravensburger-ryan-miller-interview-d23-expo/.

42. While the game did not provide many details when first announced in 2022, in or around April 2023, Upper Deck was able to inspect Lorcana's publicly posted rules, and determined Lorcana and Rush of Ikorr were nearly identical, as discussed further below. Several creative, expressive features in Lorcana were novel and proprietary to Rush of Ikorr and their replication into Lorcana can only be the product of Miller's theft.

43. Ravensburger has already sold packs of cards for Lorcana. Ravensburger has also allowed people to test play the game at conventions and other promotional events.

**G.    An Overview of Rush of Ikorr**

*1.    The basics*

44. Rush of Ikorr is a TCG designed to last approximately an hour. It can be played one-on-one or with multiple players per team without major changes to gameplay mechanics.

*2.    Building your deck*

45. To play, each player needs cards which are purchased from Upper Deck. The player uses purchased cards (or ones he/she has acquired through trading, etc.) to strategically build a deck consisting of 40 cards. There can be no more than three

identical cards in a deck and the deck can only contain two colors of cards. There are four colors to select from: yellow, green, blue, and red.

46.    There are also five card types: Champions (playable creatures that Attack enemies or engage in Raids), Locations (effects put into play and remain until destroyed), Spells (one-time actions a player can initiate), Avatars (this represents the player and helps to determine the two color composition of a deck), and Overlays (Cards that can modify Champions).

47.    The cards in Rush of Ikorr contain "Abilities" (*i.e.*, keywords) which add certain effects to the cards. As example, a card with the Ability "Support" has the ability to provide a friendly Champion with extra Strength. A card with the Ability "Elusive" can only be Attacked by other Champions with the "Elusive" ability. A card with the Ability "Formidable" will destroy the opponent it faces in battle, even if it would otherwise lose the fight based on its relative strength rating.

*3.    Beginning to play*

48.    With a deck built and in hand, at the outset of the game, each player or team takes on the role of an Avatar of a god from an ancient culture, such as Greece or Maya.

49.    To start the game-play, players draw the top five cards from their shuffled deck into to their hand.

50.    When it is your turn, a player will draw an additional card to their hand, then may draw a card face down to place directly to the "Influence Zone."

51.    The Influence Zone serves as the resource pool for the player. Cards are placed into the Influence Zone face down and each card in the Influence Zone represents one "Influence" during each turn of play. Influence is the resource that players consume in order to place the cards in their hand into the field of play. Each card has a "Recruit Cost" dictating how much "Influence" the player must spend to play the card. For example, a card with a Recruit Cost of four requires four face down cards (*i.e.* "Influence") to be in the player's Influence Zone in order to be summoned

into the field of play. Influence is consumed for only one round and is returned for the player's next turn.

52.    After drawing a card into the Influence Zone, the player enters the "Main Phase." During the Main Phase, players can exhaust their Influence to summon a card, activate a card's ability, or Attack an enemy Raider. One caveat is that players cannot Raid or Attack on the first turn a Champion is summoned unless the Champion has an Ability granting it the means to do so.

53.    Players can also send their Champions on Raids during the Main Phase. Raids last one turn and is the mechanism by which players earn Gems—Rush of Ikorr's win currency. Champions are assigned a "Raid Value" which is the number of Gems the Champion will earn if the Raid is successful.

54.    Champions are vulnerable to enemy attacks while Raiding. If an attack is performed on a Raider, the cards' Strength values will be compared, where the card with the lowest Strength value is destroyed. In the case where the cards have equal Strength, both cards are destroyed. At the core of Rush of Ikorr is the mechanic that in order to acquire win currency, Gems, the player must put their Champions in a vulnerable state.

55.    Unique to Rush of Ikorr, the win conditions require players to build themselves up, as opposed to the predominant TCG win condition of annihilating your opponent. As mentioned, Rush of Ikorr utilizes a win currency called Gems. Gems are gained through Raiding and once gained, cannot be lost. Players win Rush of Ikorr by being the first to gain the set number of Gems which depends on the amount of individuals playing on each side.

56.    In essence, the core gameplay loop of Rush of Ikorr is to: (1) summon Champions; (2) engage in Raids; (3) mount Attacks to stifle enemy Raids; and (4) retrieve Gems.

**H.    Lorcana Functions Just Like Rush of Ikorr**

*1.    The basics*

57.    Lorcana is a TCG which can be played within an hour. It can be played one-on-one or with multiple players without major changes to gameplay mechanics.

*2.    Building your deck*

58.    To play, each player needs cards which are purchased from Ravensburger or Disney. The player uses purchased cards (or ones he/she has acquired through trading, etc.) to strategically build a deck consisting of 60 cards. There can be no more than 4 identical cards in a deck and the deck can only contain two colors of cards maximum out of 6 colors to choose from (yellow, green, blue, purple, red, or grey).

59.    There are four card types: Characters (playable creatures that Challenge enemies or engage in Quests), Items (effects put into play and remain until destroyed), Actions (one-time advantages a player can initiate), and Songs (a sub-type of Actions).

60.    The cards in Lorcana contain "Abilities and Effects" (*i.e.*, keywords) which add effects to the card. The Abilities and Effects in Lorcana in many cases are copied and pasted from that of Rush of Ikorr. For example, some cards in Lorcana contain a "Support" Ability which allows the Character to provide friendly Characters with Strength. Some cards contain an Ability called "Evasive" which has the same exact effect as the "Elusive" Ability in Rush of Ikorr. Further, some cards in Lorcana also contain an Ability that has the same effect as the "Formidable" Ability in Rush of Ikorr. Because all the Lorcana cards are not yet publicly available, Upper Deck cannot know the full extent of the overlap between the cards in each game, but believes and is informed there are others.

*3.    Beginning to play*

61.    With a deck built and in hand, at the outset of the game, each player takes on the role of an Avatar or "Illumineer" Disney characters.

62.    To start the game-play, players begin by drawing seven shuffled cards to their hand.

63.     During the player's turn, he/she will draw an additional card to their hand and may put a card face down into the "Inkwell" at any time. Ink is the resource players consume in order to place the cards in their hand into the field of play. For example, a card with a "Cost" of four requires four "Inks" or face down cards in the player's Inkwell. Ink is consumed for only one round and is returned for the player's next turn. The Inkwell functions near-identically to Rush of Ikorr's Influence Zone.

64.     After drawing a card to their hand, the player enters the "Main Phase." During the Main Phase, players can exhaust their Ink to summon a card, activate a card's ability, or Challenge a Questing enemy. Just like Rush of Ikorr, players cannot Quest or Challenge on the first turn a Character is summoned unless the Character has an Ability allowing it to do so.

65.     Once in the field of play, players can send their Characters on Quests during the Main Phase. Quests last one turn and is the mechanism by which players earn Lore—Lorcana's win currency. Characters are assigned a "Lore Value" which is the number of Lore the Character will earn if the Quest is successful. Lore and Lore Value function identically to Rush of Ikorr's Gems and Raid value.

66.     Characters are vulnerable to enemy Challenges while Questing. If a Challenge is performed on a Questing enemy, the cards' Strength (damage dealt) and Willpower (damage received before banishment) are compared, where a card is banished if its Willpower is of less value than its opponent's Strength. Like Rush of Ikorr, at the foundation of Lorcana's gameplay is that to acquire its win currency, Lore, the player must put their Characters in a vulnerable state.

67.     Also like Rush of Ikorr, the win conditions in Lorcana require players to build themselves up, as opposed to the predominant TCG win conditions of annihilating your opponent. This is through the use of the win currency "Lore," which are gained through Questing and cannot be lost once gained. Players win Lorcana by being the first to gain twenty Lore.

68.    Thus, the core gameplay loop of Lorcana is to: (1) summon Characters; (2) engage in Quests; (3) mount Challenges to stifle enemy Quests; and (4) retrieve Lore.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Breach of Contract**
**(Against Defendant Miller)**

69.    Upper Deck re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

70.    As a condition of his provision of services to Upper Deck, Miller signed and agreed to abide by (1) the terms of the Summit Agreement between himself and Upper Deck and (2) the terms of the Work For Hire Agreement between Miller and Upper Deck (collectively, the "Agreements"). Both Agreements prohibited Miller from, among other things, using or disclosing Upper Deck's intellectual property and confidential information. Each Agreement also makes clear that any concepts developed by Miller while working under the Agreements belong exclusively to Upper Deck and not Miller. Miller is not to disclose, use, or otherwise benefit from the work he performed for Upper Deck outside of that relationship.

71.    Upper Deck fully complied with and fulfilled its obligations under the Summit Agreement and Work For Hire Agreement by, among other things, compensating Miller in accordance with the Agreements for the services he rendered.

72.    Miller breached his Summit and/or Work For Hire Agreements by, without authorization, copying Upper Deck's proprietary and novel TCG game and disclosing the central, proprietary components and expressions within the game to Upper Deck's direct competitor, Ravensburger, to develop the Lorcana trading card game.

73.    Upper Deck has sustained and will sustain damages as a direct and proximate result of Miller's breach of the Agreements. This includes but is not limited

1    to lost sales, loss of goodwill and popularity of the game, and loss of related revenue

2    streams.

**SECOND CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Against Defendant Miller)**

5    74.    Upper Deck re-alleges and incorporates by reference each and every

6    allegation in this Complaint as though fully set forth herein.

7    75.    Upper Deck retained Miller as the lead game designer to manage and

8    develop its next hit TCG based on his long history in the industry and specialized,

9    trusted expertise.

10   76.    Miller possessed expert knowledge in a unique field that requires

11   specialized expertise: professional game design for TCGs.  While Upper Deck does

12   many things "in house," the development of a successful TCG requires the specialized

13   skill and expertise from someone like Miller. There are only a handful of individuals

14   like Miller in this industry. This creates their value and the corresponding expectation

15   that gaming companies like Upper Deck can trust game designers' representations and

16   ability to keep novel, proprietary concepts and other intellectual property secret.

17   77.    Miller agreed to provide his expertise and professional advice to Upper

18   Deck to develop its next hit TCG, but only on strict terms of confidentiality and non-

19   disclosure given the competitive landscape.  Upper Deck reasonably expected Miller

20   to abide by his professional duties of care and loyalty owed to Upper Deck.  The nature

21   of Miller's professional services entrusted him with some of Upper Deck's most

22   sensitive,  developing concepts, intellectual property, and proprietary information. In

23   return, Upper Deck required Miller to safeguard this information and make no use of

24   it beyond his retention by Upper Deck to develop Rush of Ikorr.  As a result, Miller

25   has a continuing duty to not take, use, or disclose this information.

26   78.    Miller breached his fiduciary duty to Upper Deck by stealing core

27   concepts and proprietary, novel elements of Upper Deck's game and using it to

28   develop Lorcana.

79.    Miller's breach has proximately caused irreparable injuries to Upper Deck and is substantially likely to continue causing irreparable injuries to Upper Deck.

80.    The aforementioned acts of Miller were willful, wanton, malicious and oppressive and were undertaken with the intent to defraud, which conduct justifies the awarding of exemplary and punitive damages in an amount to be determined at trial. Upper Deck is further entitled to attorney's fees.

**THIRD CAUSE OF ACTION**
**Fraud (Concealment and Misrepresentation)—Cal. Civ. Code § 1709-1710**
**(Against Defendant Miller)**

81.    Upper Deck re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

82.    Miller, as a work for hire contractor that specifically agreed and acknowledged that he would keep in confidence the nature of his work for Upper Deck, had a special relationship and owed a fiduciary duty.

83.    During his engagement with Upper Deck for Rush of Ikorr, Miller, who lived in the same city as Ravensburger's United States headquarters, had discussions with Ravensburger relating to his possible employment with Ravensburger to work on a TCG. Miller failed to disclose this to Upper Deck.

84.    Upon his departure from Upper Deck, Miller did not disclose that he would be going to work for a competitor designing a competing, near-identical TCG based on and using Upper Deck's Rush of Ikorr property.  Upper Deck did not know or have reason to know of these facts. To Upper Deck's knowledge, while Ravensburger is a well-known gaming company, they have never created a TCG in the past and Upper Deck had no reason to believe that it would create its first TCG with Miller's assistance. In prior instances when Miller created products for Ravensburger, these were adventure books and other non-TCG products.

85.    At the time he terminated the Upper Deck contract, Miller also made misleading, deceptive statements as well as partial disclosures of fact relating to the termination of his relationship with Upper Deck and the commencement of his

relationship with Ravensburger. Miller advised Upper Deck's in-house gaming employees such as Mark Shaunessy and Bubby Johanson that he was ending his contract to obtain or find more traditional full-time employment with benefits so he was discontinuing his work as a freelance game designer. However, he did not share other facts including that (1) that he was terminating his contract with Upper Deck to start working on Ravensburger's first ever (to Upper Deck's knowledge) TCG, and (2) that he would be using the Rush of Ikorr drafts and designs to facilitate his work on the new TCG. Only Miller knew these undisclosed facts that he intended to keep secret from Upper Deck.

86.     Upper Deck did not know and had no reason to know that Miller had already accepted or was in the process of accepting employment with Ravensburger and that the employment would entail designing a TCG as opposed to the host of other gaming products Ravensburger is traditionally known for like board games, craft and science toys, and puzzles. And Upper Deck did not know and had no reason to know that Miller would take its game designs and drafts for use in creating the Lorcana game.

87.     Miller made these statements and omissions intending for Upper Deck to rely on them to avoid suspicion regarding his potential misuse of the in-progress Rush of Ikorr game or his retention of the working drafts and other materials relating to this game. He also sought to avoid an action by Upper Deck at the time he left to ensure there would be no misuse of the Rush of Ikorr materials and/or to avoid Upper Deck bringing an action against either halting his competing work for Ravensburger or ensuring that Miller would not use any of Upper Deck's property in working on the competing game.

88.     Miller also intentionally concealed from Upper Deck his intent to seize its confidential and proprietary game and transfer them to Ravensburger without Upper Deck's knowledge. By the time Upper Deck learned of the specific details of

the Lorcana game in 2023, it was too late to prevent Miller from using the drafts and work materials relating to Rush of Ikorr to create Lorcana.

89.     Miller continued to have an on-going relationship with Upper Deck employees after he terminated his work on Rush of Ikorr, without ever mentioning to Upper Deck or its employees that he had stolen and continued to use Upper Deck's property.  Miller did so to deceive Upper Deck and avoid it finding out about his plans to design a competing, identical game.

90.     During his engagement with Upper Deck, had Upper Deck known that Miller was talking to and/or potentially working with Ravensburger, or alternatively, known Ravensburger was later planning to begin the development of a TCG nearly identical to Rush of Ikorr, Upper Deck would have responded differently. Such responses would have included, without limitation, seeking to ensure Miller returned and destroyed any copies of any documents Miller had relating to Rush of Ikorr, seeking to enjoin the competing, knock-off TCG, and/or preventing its current employees and contractors from communicating with Miller about Rush of Ikorr.

91.     Upper Deck was unaware of the material facts that were suppressed and concealed by Miller. If Upper Deck had been aware, it would have taken affirmative action to protect its ideas, concepts, details, and intellectual property from Miller's wrongful acts.

92.     As a proximate result of Miller's intentional and fraudulent conduct, Upper Deck suffered, and continues to suffer harm in having a competing TCG that copies the essence of Rush of Ikorr released and sold as Upper Deck continues to try to bring its product to market. Miller's concealment is a substantial factor in this harm as it would not have occurred but for the concealment and related activities by Miller and Ravensburger.

93.     The aforementioned acts of Miller were willful, wanton, malicious and oppressive and were undertaken with the intent to defraud.

94.     Since Upper Deck meets all the elements for fraudulent misrepresentations and concealment, Upper Deck seeks an award of exemplary and punitive damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Inducing Breach of a Written Contract**
**(Against Defendant Ravensburger)**

95.     Upper Deck re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

96.     The Agreements are valid and enforceable contracts between Upper Deck and Miller.

97.     Upper Deck is informed and believes that Ravensburger knew or reasonably should have known Miller was subject to valid confidentiality contracts before it extended Miller an offer to join Ravensburger. Upper Deck is informed and believes that, as a reasonably prudent employer, Ravensburger's hiring process and onboarding of new employees entails things like:

    a.    Having a hiring policy that cautions against hiring someone with the goal of acquiring confidential, proprietary, or trade secret information stemming from the individual's prior work for other companies;

    b.    Informing new hires that, in providing services to Ravensburger, the employee is not to use or disclose any confidential, proprietary, or trade secret information that they retain from prior work.

    c.    Creating a clear process for discussing the potential use of confidential, proprietary, or trade secret materials in their work for Ravensburger.

    d.    Forbidding employees from retaining any confidential, proprietary, or trade secret information from their past work and disclosing to Ravensburger any such retention.

    e.    Identifying the existence of any confidentiality agreements or restrictive covenants from former work that may impact or overlap with the work the employee carries out for Ravensburger.

98.    Through this or a similar due diligence process, Ravensburger would have been made aware of the two Upper Deck-Miller agreements and their confidentiality and other protective clauses. Such a process is particularly important and all the more likely to be carried out where a company hires a former freelance worker who is sure to have many contracts with many companies calling for confidentiality, non-disclosure, and/or restrictive covenants. Given that Miller was specifically brought on for a role designing a TCG, asking about any such contracts in the context of TCGs would be especially likely and common.  On information and belief, Ravensburger was aware of Miller's contracts with Upper Deck as a result of this or similar processes.

99.    Furthermore, given the small nature of this industry and Miller's relationship with employees and other Ravensburger representatives, it is highly unlikely that Ravensburger lacked any knowledge of the work Miller conducted prior to joining it to design a TCG. Common interview questions would center around recent relevant experience and Miller's interest in designing a TCG. Casual conversations and industry knowledge further cement the same.

100.    Rather than allow Miller to honor the Agreements and their terms, Upper Deck is informed and believes that Ravensburger induced and intended for Miller to breach his obligations so that it could quickly put together the Lorcana game based largely off the working draft of Rush of Ikorr that Miller was paid to develop for Upper Deck. Ravensburger did this to capitalize on Miller's knowledge of the elements of the Rush of Ikorr game so he could make a near-identical game for it. This allowed Ravensburger to gain a competitive advantage, an accelerated launch, and bring a nearly identical TCG to market under a different brand.

101.    Upper Deck is informed and believes that Ravensburger's desire to leverage this competitive advantage caused Miller to breach his Agreements with Upper Deck. Ravensburger should not have allowed Miller to subsequently design and create such a similar TCG to the one he previously helped develop with Upper

Deck pursuant to the Agreements. Ravensburger knew or should've known Miller would utilize the details and confidential work product Miller prepared for Upper Deck. Looking to cut the line and save money on development, Ravensburger hired Miller away from Upper Deck and used Upper Deck's drafts and working concept for Rush of Ikorr to develop its competing game.

102.    Ravensburger knew or reasonably should have that hiring away Upper Deck's lead game designer mid-way through game development would interfere with the contracts calling for completion of a TCG product.

103.    Upper Deck has been harmed by Ravensburger's conduct, including, but not limited to, lost sales, loss of goodwill and popularity of the game, thwarting the Rush of Ikorr launch, loss of related revenue streams, loss of capital, costs and expenses paid to Miller and others to develop Rush of Ikorr, time delay costs, and loss of further internal resources dedicated to Rush of Ikorr. Ravensburger's actions in hiring away from Upper Deck and tasking Miller make the same product for it was a substantial factor in this harm.

104.    As a result of the breaches of the Agreements with Miller, Upper Deck has been injured and faces irreparable injury. Upper Deck is threatened with losing investment in amounts which may not be possible to determine, unless Ravensburger is enjoined and restrained by order of this Court.

### FIFTH CAUSE OF ACTION
**Intentional Interference with Prospective Economic Relations**
**(Against Defendant Ravensburger)**

105.    Upper Deck re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

106.    Upper Deck and Miller were in a contractual and economic relationship concerning the development of Rush of Ikorr.

107.    As set forth in the Fourth Cause of Action and elsewhere above, Ravensburger knew of, or should have known of, this contractual relationship.

108.    Despite the existence of the contracts and economic relationship between Upper Deck and Miller, Ravensburger hired Miller away from Upper Deck to use the confidential, proprietary drafts and other work product developed by Upper Deck and Miller for Rush of Ikorr to develop the competing Lorcana game.

109.    This resulted in termination of the Upper Deck-Miller contracts and a disruption in Upper Deck's development of the Rush of Ikorr game. It also introduced a competing, infringing game into the market to Upper Deck's further detriment.

110.    Ravensburger further engaged in wrongful conduct by applying game mechanics, details, and designs stolen from Upper Deck to create Lorcana.

111.    The relationship between Upper Deck and Miller was disrupted in that Miller abruptly stopped working for Upper Deck and failed to comply with his contractual duties to Upper Deck, namely not using or disclosing the confidential information he learned while working on Rush of Ikorr for any other purpose.

112.    As a proximate result of the above-mentioned acts of Ravensburger, Upper Deck has been damaged in the ways described herein, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Copyright Infringement
### (Against Defendants Miller and Ravensburger)

113.    Upper Deck re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

114.    Upper Deck has registered and is the owner of two[1] copyrights. The first, Copyright Registration Number VAU 1-499-443, is the working daft of the Rush of Ikorr[2] game at the time that Miller terminated his relationship with Upper Deck (referred to herein as "Game Design 2020"). The second, Copyright Registration

---

[1] Upper Deck reserves its right to amend to add additional copyrights to this cause of action as additional materials are registered with the copyright office.

[2] "Rush of Ikorr" is the current working title of Upper Deck's TCG, but it has gone by other names in the past like "Shell Beach."

Number VAu 1-500-801, is the more current 2023 version of the working draft of the Rush of Ikorr game that has further evolved and developed since Miller's departure (referred to herein as "Game Design 2023"; collectively the two copyrights will be called "Game Designs").

115.   Miller had access to the expressions and creative choices depicted in the Game Designs through his work for Upper Deck under the two contracts. He helped to create these works on a work for hire basis. While the 2023 version of the Game Design post-dates Miller's employment, the relevant information contained therein was in other drafts and works that he had access to during his contractual tenure with Upper Deck. Ravensburger, through hiring and having Miller design its game had the same access.

116.   Many aspects of the Lorcana game are substantially similar or virtually identical to protected aspects of the Game Designs. While the entire Lorcana product is not yet publicly available and Plaintiff anticipates uncovering further instances of copying, at this time, Upper Deck identifies several examples of copying of protected expression between the Game Designs and the Lorcana game below:

a.    Substantially similar or near identical Creatures/Champions (Rush of Ikorr) and Characters (Lorcana):

| Rush of Ikorr Creature/Champion | Lorcana Character |
|---|---|
| Elusive: This creature can only be attacked by other elusive creatures. | Evasive (Only characters with Evasive can challenge [*i.e.* attack] this character) |
| Support: Target other friendly champion gets +X strength until the beginning of your next turn. X = this champion's strength. | Support (Whenever this character quests, you may add their [strength] to another character's [strength] this turn) |

| Rush of Ikorr Creature/Champion | Lorcana Character |
|---|---|
| Defender (f/k/a Bodyguard): A player's raiding champions with defender must be attacked (until there are none left) before any raiding champions without defender can be attacked. | Bodyguard: This character may enter play exerted. An opposing character who challenges one of your characters must choose one with Bodyguard if able. |
| Charge or Sneak Attack: This creature may attack the turn you summon it. | Rush: This character can challenge [*i.e.* attack] the turn they're played [*i.e.* summoned]. |

  b.  Substantially similar or near identical unique and expressive game effects:

| Rush of Ikorr | Lorcana |
|---|---|
| Players must build decks from only two colors of cards and no more; certain "loyal" card effects further limit deck building and character selection. | Players must build decks from only two colors of cards and no more; "loyal" card effects give unique advantages when in the same deck. |
| To score points, raiding champions must exhaust which is the only time they can be attacked. | To score points, questing characters must exhaust which is the only time they can be attacked. |
| "Formidable" power of some cards card means whenever the champion loses a battle, also destroy the enemy champion. | Has a "Lose Something?" card with the same effect: "When this character is challenged and banished, banish the challenging character." |
| Influence Zone, expressed as standalone pseudo-discard pile where players accumulate resources needed to bring cards into play and which remains permanent. | Inkwell, expressed as a standalone pseudo-discard pile where players accumulate resources needed to bring cards into play and which remains permanent. |

  117. In addition to being directly liable for copyright infringement, Ravensburger is also vicariously liable for Miller's infringement because it had the

1  right and ability to supervise Miller's development of Lorcana and it had a direct
2  financial interest in creating and selling this game.

3      118.  As a result of the infringement of Upper Deck's work, Upper Deck is
4  entitled to damages available under the Copyright Act.

5              **SEVENTH CAUSE OF ACTION**
               **Conversion**
6      **(Against Defendants Miller and Ravensburger)**

7      119.  Upper Deck re-alleges and incorporates by reference each and every
8  allegation in this Complaint as though fully set forth herein.

9      120.  Upper Deck owned the property at issue—Rush of Ikorr as a whole and
10 the related design, details, concepts, and mechanics upon which Rush of Ikorr is
11 played—and Upper Deck was entitled to immediate possession at the time of
12 conversion.

13     121.  Miller and Ravensburger knowingly took possession of and applied
14 Upper Deck's property to develop a TCG for its own account and benefit. Miller's
15 and Ravensburger's wrongful acts are substantial in that much of the Lorcana game is
16 based on Rush of Ikorr. Furthermore, Miller's and Ravensburger's theft of Upper
17 Deck's property put Upper Deck's product in peril. For example, if Upper Deck was
18 to release Rush of Ikorr after the launch of Lorcana, the market may incorrectly
19 assume that Rush of Ikorr is an imitation of Lorcana, when in fact the opposite is true.
20 Alternatively, if Ravensburger ruins or mismanages the Lorcana game launch and/or
21 play, Ravensburger will negatively effect the anticipation and sales for Rush of Ikorr.

22     122.  Accordingly, Upper Deck is the lawful owner of the game design and
23 mechanics; Upper Deck was in lawful possession of said property; Upper Deck did
24 not authorize Miller or Ravensburger to retain said property (rather, the Agreements
25 expressly prohibit such retention); and Miller and Ravensburger applied and continue
26 to apply that property for their own use.

27     123.  As a direct and proximate result of Miller's and Ravensburger's wrongful
28 actions, Upper Deck has been damaged in an amount according to proof.

124.   The aforementioned acts of Miller and Ravensburger were willful, wanton, malicious and oppressive and were undertaken with the intent to defraud, which conduct justifies the awarding of exemplary and punitive damages in an amount to be determined at trial. Upper Deck is further entitled to attorney's fees.

**EIGHTH CAUSE OF ACTION**
**Unfair Competition —Bus. & Prof. Code, § 17200 et seq.**
**(Against Defendants Miller and Ravensburger)**

125.   Upper Deck re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

126.   Since at least September 2022 through the present, Ravensburger unconscionably and without authorization, used and disseminated Upper Deck's confidential and proprietary game design to promote and market Ravensburger's newest TCG, Lorcana – a TCG with its entire foundation resting on game details, designs, concepts, and mechanics that are and have always been Upper Deck's sole property.

127.   Ravensburger, unless restrained, will continue to use and disseminate Upper Deck's property as described herein for purposes of their own enrichment and financial gain. This is both illegal and unfair under the UCL.

128.   The conduct of Miller and Ravensburger, as described herein, constitutes unfair competition in violation of California Business & Professions Code, Section 17200, *et seq.*

129.   As a proximate result of Miller's and Ravensburger's conduct, Upper Deck is entitled to injunctive relief, disgorgement of ill-gotten gains such as revenue and income earned by Ravensburger based on the wrongful acts described herein (other than the copyright claim which is not at issue under this UCL claim).

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Upper Deck prays for judgment in its favor and against Ryan Miller and Ravensburger, inclusive as follows:

/ / /

1. For general and special damages in an amount to be determined according to proof;

2. For injunctive relief enjoining Ravensburger from publicly releasing Lorcana;

3. For restitution;

4. For punitive damages in an amount appropriate to punish Miller and Ravensburger and deter others from engaging in similar misconduct;

5. For attorneys' fees where permissible under applicable law;

6. For costs of this suit;

7. For interest at the maximum legal rate;

8. For an order declaring that Ravensburger holds Upper Deck's intellectual property in trust for Plaintiff;

9. For appointment of a receiver as an elisor to sign Upper Deck's provisional patent application on Miller's behalf; and

10. For any other remedies at law or in equity that the court deems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Upper Deck demands a trial by jury on all issues so triable.

Respectfully submitted:
Dated: July 31, 2023                    **NICHOLAS & TOMASEVIC, LLP**


By:    */s/ Craig M. Nicholas*
Craig M. Nicholas (SBN 178444)
Shaun Markley (SBN 291785)
Jordan Belcastro (SBN 339570)
225 Broadway, 19th Floor
San Diego, CA 92101
Tel: (619) 325-0492
Fax: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: smarkley@nicholaslaw.org
Email: jbelcastro@nicholaslaw.org

Attorneys for Plaintiff,
THE UPPER DECK COMPANY