The Honorable Kymberly K. Evanson

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON**

THE UPPER DECK COMPANY, a Nevada corporation,

Plaintiff,

vs.

RYAN MILTON (a/k/a RYAN MILLER), an individual; RAVENSBURGER NORTH AMERICA, INC., a Washington corporation,

Defendants.

Case No.: 2:23-cv-01936-KKE

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**NOTE ON MOTION CALENDAR: MARCH 1, 2024**

## TABLE OF CONTENTS

I.     **INTRODUCTION AND BRIEF FACTUAL BACKGROUND** ................................... 1

II.     **LEGAL STANDARD** ................................................................ 2

III.     **ARGUMENT** ........................................................................ 3

      A.     **California Law Applies to this Case.** .................................... 3

           1.     *Following a Convenience Transfer, Courts Assess Personal Jurisdiction in the Transferor Court to Guide the Choice of Law Analysis.* ................................................................ 3

           2.     *Specific Jurisdiction Over Defendants Exists Here; California Law Applies.* ................................................ 3

      B.     **Defendants' MTD For Failure To State A Claim Should Be Denied.** ................................................................ 6

           1.     *The Recurring Economic Loss Rule Arguments Are Misplaced.* ....................................................... 6

           2.     *UD Adequately Alleges the Fiduciary Duty Claim.* ................. 7

           3.     *UD Adequately Pleads Fraud.* ................................... 10

           4.     *UD's Inducing Breach of Contract Claim Survives.* .............. 12

           5.     *Upper Deck Adequately Pleads Intentional Interference against Ravensburger.* ........................................... 14

           6.     *Copyright Claims Are Adequately Stated Also.* .................. 16

           7.     *UD Adequately Pleads the Conversion Claim.* .................. 20

           8.     *Defendants' UCL Attacks Also Fail.* ........................... 21

           9.     *UD Seeks Leave to Amend.* .................................... 21

IV.     **CONCLUSION** .................................................................. 21

Nicholas & Tomasevic, LLP
225 Broadway, 19th Floor, San Diego, CA 92101
Tel: (619) 325-0492 | Fax: (619) 325-0496

# TABLE OF AUTHORITIES

**CASES**

*Aagard v. Palomar Builders, Inc.*,
    344 F. Supp. 2d 1211 (E.D. Cal. 2004) ............................................................8

*Abrams v. Blackburne & Sons Realty Cap. Corp.*,
    No. 219CV06947CASAS,
    2019 WL 8640656 (C.D. Cal. Dec. 2, 2019) ......................................................9

*Albert's Organics, Inc. v. Holzman*,
    445 F. Supp. 3d 463 (N.D. Cal. 2020) ................................................................9

*Altera Corp. v. Clear Logic, Inc.*,
    424 F.3d 1079 (9th Cir. 2005) ..........................................................................15

*Apple Computer, Inc. v. Microsoft Corp.*,
    35 F.3d 1435 (9th Cir. 1994) ............................................................................17

*Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*,
    672 F.2d 607 (7th Cir. 1982) ............................................................................19

*Barbara A. v. John G.*,
    145 Cal. App. 3d 369 (1983) ..............................................................................8

*Beckwith v. Dahl*,
    205 Cal. App. 4th 1039 (2012) .........................................................................11

*Bentham v. Bingham L. Grp.*,
    No. 13CV1424-MMA (WVG),
    2013 WL 12186171 (S.D. Cal. Nov. 15, 2013) ..................................................9

*Best Carpet Values, Inc. v. Google LLC*,
    No. 5:20-CV-04700-EJD,
    2021 WL 4355337 (N.D. Cal. Sept. 24, 2021) ..................................................20

*Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.*,
    149 F. Supp. 3d 1167 (N.D. Cal. 2015) ............................................................17

*Brackett v. Hilton Hotels Corp.*,
    619 F. Supp. 2d 810 (N.D. Cal. 2008) ..............................................................15

*C9 Ventures v. SVC-W., L.P.*,
    202 Cal. App. 4th 1483 (2012) ...........................................................................6

*Cho v. Hyundai Motor Co., Ltd.*,
    636 F. Supp. 3d 1149 (C.D. Cal. 2022) ..............................................................7

*City & Cnty. of San Francisco v. Cambridge Integrated Servs. Grp., Inc.*,
No. C 04-1523 VRW,
2007 WL 1970092 (N.D. Cal. July 2, 2007) .........................................................................7

*Davinci Editrice S.R.L. v. ZiKo Games, LLC*,
183 F. Supp. 3d 820 (S.D. Tex. 2016)................................................................................19

*Eastwood v. Horse Harbor Found., Inc.*,
170 Wash. 2d 380 (2010) .....................................................................................................6

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
69 F.4th 665 (9th Cir. 2023)..................................................................................................3

*Famous Birthdays, LLC v. SocialEdge, Inc.*,
No. CV 21-9562 PA (MRWX),
2022 WL 1591723 (C.D. Cal. Apr. 15, 2022)...............................................................17, 18

*Fine v. Kansas City Life Ins. Co.*,
627 F. Supp. 3d 1153 (C.D. Cal. 2022)...............................................................................21

*Fluke Elecs. Corp. v. CorDEX Instruments, Inc.*,
No. C12-2082JLR,
2013 WL 566949 (W.D. Wash. Feb. 13, 2013) ....................................................................5

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ...........................................................................................................4, 5

*GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*,
83 Cal. App. 4th 409 (2000) .................................................................................................8

*Gilmore Bank v. AsiaTrust New Zealand Ltd.*,
223 Cal. App. 4th 1558 (2014)............................................................................................10

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ..............................................................................................................3

*Johnston v. RealD*,
No. CV 13-3433 PSG (CWX),
2014 WL 12686908 (C.D. Cal. Jan. 14, 2014).....................................................................8

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95, 119 (2006)...................................................................................................10

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000)..................................................................................................2

*Kremen v. Cohen*,
337 F.3d 1024 (9th Cir. 2003)..............................................................................................20

*Maloney v. T3Media, Inc.*,
    853 F.3d 1004 (9th Cir. 2017) ......................................................................................14

*Mattel, Inc. v. MGA Entertainment, Inc.*,
    616 F.3d 904 (9th Cir. 2010) ...................................................................................16, 17

*Mee Industries, Inc. v. Adamson*,
    2018 WL 6136813 (C.D. Cal. July 27, 2018) .................................................................5

*Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.*,
    6 Cal. App. 4th 603 (1992) ...........................................................................................11

*N. Am. Chem. Co. v. Superior Ct.*,
    59 Cal. App. 4th 764 (1997) .......................................................................................6, 7

*N. Star Media, LLC v. Winogradsky-Sobel*,
    No. CV 11-466 PSG (CWX),
    2011 WL 13220157 (C.D. Cal. May 23, 2011) .............................................................15

*Nintendo of Am., Inc. v. Storman*,
    No. CV197818CBMRAOX,
    2020 WL 2463374 (C.D. Cal. Jan. 15, 2020) ...............................................................16

*Norwest Mortg., Inc. v. Superior Ct.*,
    72 Cal. App. 4th 214 (1999) .........................................................................................10

*Peter Gellman, et al., v. Andrea Hunsinger, et al.*,
    2021 WL 4295289 (S.D. Cal. Sept. 20, 2021) ................................................................8

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015) ........................................................................................4

*Reeves v. Hanlon*,
    33 Cal. 4th 1140, 95 P.3d 513 (2004) .............................................................................8

*Robinson Helicopter Co. v. Dana Corp.*,
    34 Cal. 4th 979 (2004) ...................................................................................6, 9, 12, 20

*Roddenberry v. Roddenberry*,
    44 Cal. App. 4th 634 (1996) .........................................................................................11

*Ross v. AT&T Mobility, LLC*,
    No. 19-CV-06669-JST,
    2020 WL 9848766 (N.D. Cal. May 14, 2020) .................................................................6

*S.M. Wilson & Co. v. Smith Int'l, Inc.*,
    587 F.2d 1363 (9th Cir. 1978) ........................................................................................6

*Sacramento Reg'l Transit Dist. v. Grumman Flxible*,
    158 Cal. App. 3d 289 (Ct. App. 1984) ............................................................................6

Nicholas & Tomasevic, LLP
225 Broadway, 19th Floor, San Diego, CA 92101
Tel: (619) 325-0492 | Fax: (619) 325-0496

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004)..............................................................................4, 5

*Sciara v. Campbell*,
   840 F. App'x 920 (9th Cir. 2020) ............................................................................5

*Sheen v. Wells Fargo Bank, N.A.*,
   12 Cal. 5th 905 (2022).............................................................................................6

*Sleep Sci. Partners v. Lieberman*,
   No. 09-04200 CW,
   2010 WL 1881770 (N.D. Cal. May 10, 2010) ......................................................14

*Smith v. Weeknd*,
   2019 WL 6998666 (C.D. Cal. Aug. 23, 2019) ......................................................14

*Smith v. Weeknd*,
   2019 WL 6998777 (C.D. Cal. Nov. 6, 2019) ........................................................15

*Spry Fox LLC v. LOLApps Inc.*,
   2012 WL 5290158 (W.D. Wash. Sept. 18, 2012) .................................................19

*United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*,
   660 F. Supp. 2d 1163 (C.D. Cal. 2009).................................................................9

*Usher v. City of Los Angeles*,
   828 F.2d 556 (9th Cir.1987)................................................................................2, 3

*Wilder v. CBS Corp.*,
   No. 2:12-CV-8961-SVW-RZ,
   2016 WL 693070 (C.D. Cal. Feb. 13, 2016) ........................................................15

**STATUTES**

Cal. Bus. & Prof. Code, § 17203 ................................................................................22

**RULES**

Fed. R. Civ. P. 8(a) ......................................................................................................3

**TREATISES**

3 M. & D. Nimmer, *Nimmer on Copyright* § 12.09[A][2] (Rev. Ed.) .......................17

## I.    <u>INTRODUCTION AND BRIEF FACTUAL BACKGROUND</u>

This case involves Defendants' theft of confidential, proprietary, and copyright protected trading card game ("TCG") work product that Plaintiff paid a gaming expert, Ryan Miller ("Miller"), to develop under his trusted role as lead game designer. Seeking a competitive edge and to hit the ground running with its own competing TCG, Defendant Ravensburger brought Miller on to work on its Lorcana TCG using his working knowledge and designs from The Upper Deck Company' ("UD") TCG now titled Rush of Ikorr. *See generally* First Amended Complaint, ECF No. 12 ("FAC").

Defendants lodge a string of attacks on the adequacy of various causes of action. *See* Defendants' Motion to Dismiss FAC (ECF No. 46) ("Mot."). To begin, Defendants challenge specific jurisdiction and choice of law. Because the California transferor court had specific personal jurisdiction over Defendants, who directed actives towards and availed themselves of the benefits of conducting business in California relating to the claims at issue, California law applies.

Miller lodges repetitive "economic loss rule" challenges to the claims against him. These are misplaced. This is not a case involving a contract for the sale of goods which *may* bar related tort claims; it is a case involving a contract for professional services and other, independent duties that attach irrespective of any contract between the parties. Defendants either fail to appreciate this nuance or attempt to mislead the Court into applying this rule a in an inapplicable context.

Miller cannot evade the fiduciary duty claim. UD adequately alleges that Miller took on a position of great responsibility based on his special expertise and UD placed trust in him not to misuse confidential assets.

UD also adequately pleads fraud. Miller elected to make false, partial disclosures regarding his departure from his UD TCG work, claiming it was so he could obtain benefits and secure more traditional full-time employment. His real motivation was to go develop Ravensburger's first ever TCG using UD's work product. Miller did this to quell any UD concerns that he would go develop a competing game and UD had no reason to know his real plans. Miller's attacks on this claim either ignore the pleaded facts or ask the Court to interpret them in his favor.

1    The inducing breach of contract and intentional interference claims against Ravensburger

2    also survive. UD alleges actual and constructive knowledge by Ravensburger of the Miller-UD

3    relationship and that Ravensburger intended for Miller to terminate his work for UD so that it

4    could use UD's confidential materials. Ravensburger's attacks, like many of Miller's, ignore these

5    allegations or seek to twist them in its favor.

6    Copyright preemption also fails because Defendants challenge whether the materials at

7    issue are validly subject to copyright protection at all leaving room for UD to proceed in the

8    alternative at this stage of the case. Further still, where a competitor weakens the market for a good

9    that is also copyrighted, non-copyright claims survive.

10    Defendants' attacks on the copyright cause of action are equally misplaced. UD sets out

11    exact names of character abilities and game effects, along with quotes of the creative descriptions

12    for those abilities and effects from its copyright registrations. It also identifies those registrations

13    by number. It then demonstrates how the Lorcana game uses identical or near-identical character

14    ability and game effect names and describes these abilities and effects in an identical or near-

15    identical way. This is all that is required at this pleadings stage.

16    The conversion claim is adequately alleged also. The creative expression and designs that

17    Defendants stole and implemented in their Lorcana TCG were not mere ideas floating in the air.

18    These items were set out in drafts and other documents that Defendants accessed and took for their

19    own use.

20    The Court should reject the various attacks on the adequacy of the pleadings.

21    **II.**     **LEGAL STANDARD**

22    A 12(b)(6) motion to dismiss for failure to state a claim may not be granted "unless it

23    appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

24    would entitle him to relief." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir.

25    2000). In ruling on such a motion, "the court must presume all factual allegations of the complaint

26    to be true and draw all reasonable inferences in favor of the nonmoving party." *Id.* (quoting *Usher*

27    *v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987)). The complaint need not set out the facts

28

1   in detail; what is required is a "short and plain statement of the claim showing that the pleader is

2   entitled to relief." *Id.* (citing Fed. R. Civ. P. 8(a)).

3   **III.    ARGUMENT**

4        **A.    California Law Applies to this Case.**

5        Although Defendants contend applicable law does not alter the outcome of the Motion,

6   they nonetheless take a passing glance at the issue and related personal jurisdiction issues. Mot.,

7   5-6. To provide clarity, the Court should address specific jurisdiction at this stage and find

8   California law applies.

9           *1.    Following a Convenience Transfer, Courts Assess Personal Jurisdiction in*

10           *the Transferor Court to Guide the Choice of Law Analysis.*

11       Defendants accurately note that, following a transfer for convenience under 1404(a) as is

12  the case here (ECF No. 29-1), this Court must "apply the state law, including the choice-of-law

13  rules, of the original transferor court." *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 69

14  F.4th 665, 674 (9th Cir. 2023). However, this is only true where the transferor court had personal

15  jurisdiction. *Id.*

16          *2.    Specific Jurisdiction Over Defendants Exists Here; California Law Applies.*

17       California law applies because the California transferor court had specific personal

18  jurisdiction.

19       Defendants attack specific personal jurisdiction with just a few lines of text, pointing out

20  that their employment relationship is in Washington where they are both located and asserting that

21  the only California connection in this case is UD's injury. Mot., 5-6. This approach focuses on

22  irrelevant facts and ignores a host of other relevant facts supporting jurisdiction.

23       As to their emphasis on home state or domicile (Washington), this is a general personal

24  jurisdictional inquiry. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924

25  (2011) ("[T]he paradigm forum for the exercise of general jurisdiction is the individual's

26  domicile."). On the other hand, specific personal jurisdiction requires the plaintiff to satisfy two

27  parts of a three-prong test for specific personal jurisdiction: (1) the defendant purposefully directed

28  activities, consummated some transaction, or purposefully availed itself of the privilege of

OPPOSITION TO MOTION TO DISMISS FIRST         Nicholas & Tomasevic, LLP
AMENDED COMPLAINT (2:23-cv-01936-KKE) – 3    225 Broadway, 19th Floor, San Diego, CA 92101
Tel: (619) 325-0492 | Fax: (619) 325-0496

conducting activities in the forum state; and (2) the claim must arise out of or relate to these forum activities. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (burden on the plaintiff to satisfy the first two prongs). Otherwise stated, personal jurisdiction exists if "a case arises out of or relates to the defendant's contacts with the forum." *Ranza v. Nike, Inc*., 793 F.3d 1059, 1068 (9th Cir. 2015). Sufficient contacts exist where "the defendant deliberately reached out beyond its home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021). Plaintiff satisfies these related requirements.

Defendants purposefully directed activities towards and availed themselves of the benefits of conducting business in California relating to the claims at issue. Through two contracts, each of which contains a California choice of law and forum selection clause, Miller agreed to develop a TCG for California company and to keep what he learned confidential. *See* ECF No. 48, Ex. 1 (Summit Agreement), §§ 7, 12; and ECF No. 48, Ex. 2 (Work for Hire Agreement), §§ 10, 14. Miller traveled to California and kept in regular contact with California-based UD employees during the course of his work. FAC, ¶¶ 5, 25-36. UD's game designs that he ultimately stole and took to Ravensburger came from Upper Deck's servers based in California. FAC, ¶¶ 4, 25-36. Further contracts occurred after his departure. For his Lorcana work , Miller interacted with eight Disney employees, three of whom were located in California. ECF No. 27-1, Ex. A at Ravensburger Resp. to ROG #2. Mr. Miller also traveled to California for his work on Lorcana, making three trips for a total of seven days. ECF No. 27-1, Ex. B at Ravensburger Suppl. Resp. to ROG #1. This included traveling to Disneyland in Anaheim, California to attend the D23 Expo. FAC, ¶ 10. Miller attended the Expo on behalf of Ravensburger and sat at the Lorcana booth. *Id.*

For its part, Ravensburger acted in concert with Miller to take Upper Deck's property from California to Washington. FAC, ¶ 8. Furthermore, the competing game Ravensburger developed has substantial, intentional California ties. Ravensburger has worked with Disney, a California company, for several years to release Lorcana. FAC, ¶¶ 9-11. The original concept for a Disney-themed TCG came about from a meeting between Ravensburger and Disney executives in Glendale, CA. ECF No. 27-1, ¶ 5 (The working title for Lorcana was named after the establishment

1   in Glendale where the meeting was held). Furthermore, Ravensburger employs at least four

2   individuals in this state all of whom worked to develop the infringing Lorcana game. ECF No. 27-

3   1, Ex. D at Ravensburger Suppl. Resp. to ROG #2. California visitors and residents were the early

4   and prime target audience for Lorcana. The game was first marketed and announced at Disney's

5   D23 Expo in Anaheim, California, where a limited number of promotional sets of Lorcana cards

6   were sold. FAC, ¶ 10; ECF. No. 27-1, Ex. C at Ravensburger Resp. to ROG #3. Further,

7   Ravensburger made pre-sales and actual sales of Lorcana, and has made deliveries of these

8   products to California consumers. FAC, ¶ 11, 43. The first live sales of Lorcana occurred

9   *exclusively* at Disney locations, such as Disneyland in Anaheim, California. *Id.* at ¶ 11.

10  Additionally, Ravensburger has entered into one or more contracts relating to Lorcana with

11  companies that are incorporated or headquartered in California and call for California choice of

12  law or venue. ECF. No. 27-1, Ex. D at Ravensburger Suppl. Resp. to ROG #1.

13         Using confidential information learned at one company to assist an out-of-state competitor

14  gives rise to personal jurisdiction in the home state of the company experiencing the theft of their

15  proprietary information. *Fluke Elecs. Corp. v. CorDEX Instruments, Inc.*, 2013 WL 566949, at

16  **4-7 (W.D. Wash. Feb. 13, 2013); *Mee Industries, Inc. v. Adamson*, 2018 WL 6136813, at *4-5

17  (C.D. Cal. July 27, 2018). Each Defendant also entered into relevant contracts relating to the

18  competing trading card games here in California and took advantage of the ability to do business

19  in California. They also exploited the California market by announcing the launch of their game

20  here and soliciting early sales directly in this state. *Ford Motor Co.*, 592 U.S. at 359; and *see e.g.*

21  *Sciara v. Campbell*, 840 F. App'x 920, 922 (9th Cir. 2020) (Personal jurisdiction established where

22  the defendant "regularly contacted [the plaintiff] in Nevada, often travelled to Nevada to meet

23  business contacts supplied by [plaintiff], worked with clients in Nevada, and hired individuals

24  from Nevada.").

25         Defendants conveniently ignore these facts and fail to carry their burden on the third part

26  of the jurisdiction test – to "present a compelling case" that the exercise of jurisdiction would not

27  be reasonable. *Schwarzenegger*, 374 F.3d at 802.

28

1     **B.**     **Defendants' MTD For Failure To State A Claim Should Be Denied.**

2     *1.*     *The Recurring Economic Loss Rule Arguments Are Misplaced.*

3     Defendants assert the economic loss rule ("ELR") as a bar to several of UD's causes of

4 action. However, this case concerns a contract for the provision of professional game design

5 services, not the purchase of goods or products. Accordingly, this rule does not apply at all.

6     California's ELR[1] is rooted in products liability. *Robinson Helicopter Co. v. Dana Corp.*,

7 34 Cal. 4th 979, 988-89 (2004). Its purpose "serves to limit the parties' rights to those provided by

8 the Uniform Commercial Code, a body of law specifically designed to deal with commercial

9 disputes between sellers and buyers of goods." *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d

10 1363, 1376 (9th Cir. 1978); *see also Sacramento Reg'l Transit Dist. v. Grumman Flxible*, 158 Cal.

11 App. 3d 289, 298 (Ct. App. 1984) ("This [economic loss] rule is necessary so that the Uniform

12 Commercial Code, governing commercial transactions, is not completely subsumed by the law of

13 tort."). This is where the ELR applies.

14     It does not apply "where the contract between the parties does not involve the sale of goods

15 or products, because such contracts are not governed by the Uniform Commercial Code." *Ross v.*

16 *AT&T Mobility, LLC*, 2020 WL 9848766, *13 (N.D. Cal. May 14, 2020); *see also C9 Ventures v.*

17 *SVC-W., L.P.*, 202 Cal. App. 4th 1483, 1494 (2012) (recognizing that transactions for the sales of

18 goods are governed by the Uniform Commercial Code and a transaction for services is governed

19 by common law). Accordingly, the ELR does not apply to contracts for the performance of

20 services. *See, e.g.*, *N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 780-81 (1997) ("*North*

21 *American*") (distinguishing cases involving defective products, for which the ELR applies, and

22 those involving defective services, for which the rule does not apply); *Sheen v. Wells Fargo Bank,*

23 *N.A.*, 12 Cal. 5th 905, 933 (2022), *reh'g denied* (June 1, 2022) (recognizing an exception to the

24 

---

25 [1] Washington law similarly limits the application of the ELR and permits recovery of economic losses in tort cases, even if the losses arise from contractual relationships. *Eastwood v. Horse*

26 *Harbor Found., Inc.*, 170 Wash. 2d 380, 388 (2010) ("[T]he fact that an injury is an economic loss or the parties also have a contractual relationship is not an adequate ground, by itself, for holding that a plaintiff is limited to contract remedies.). The fact that the litigants are parties to

27 an applicable contract does not preclude recovery in tort. Instead, "[a]n injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract."

28 *Id.* at 389.

ELR for contracts concerning professional services). As explained in *North American*, "[a] contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner. A negligent failure to do so may be both a breach of contract and a tort. … In such a hybrid circumstance, the plaintiff is entitled to pursue both legal theories until an occasion for an election of remedies arises." *N. Am. Chem. Co*., 59 Cal. App. 4th at 774; *City & Cnty. of San Francisco v. Cambridge Integrated Servs. Grp., Inc.*, 2007 WL 1970092 (N.D. Cal. July 2, 2007) (California appellate courts "continue to apply a rule that negligent failure to exercise reasonable care and skill in undertaking to perform a professional services contract is a tort as well as a breach of contract") (collecting cases).

Here, Plaintiff alleges its injuries stem from Defendant Miller's improper performance of a professional service. His engagement in a contract for services imposes a duty to perform in a competent and reasonable manner—and failure to do so may give rise to both a breach of contract and tort action. The attempt to boot-stramp a consumer goods sales doctrine into this case is inapt as the *product liability* line of cases Defendants rely on make clear. *See, e.g.*, Mot., 12 (citing *Cho v. Hyundai Motor Co., Ltd.*, 636 F. Supp. 3d 1149, 1161 (C.D. Cal. 2022) [summarizing product defect ELR cases]).

Even if the ELR were applicable here, UD addresses each ELR argument below with regard to each relevant cause of action.

### 2.    *UD Adequately Alleges the Fiduciary Duty Claim.*

Miller argues there is no plausible cause of action for fiduciary duty claims because (1) there is no fiduciary relationship between Miller and UD and (2) because of the economic loss rule. Mot., 6-9.  Miller is wrong on both counts.

As to (1), a fiduciary duty arises where undertaken by agreement.[2] This occurs where "one person enters into a confidential relationship with another. . . . [A] confidential relationship arises where a confidence is reposed by one person in the integrity of another, and the party in whom the confidence is reposed voluntarily accepts or assumes to accept the confidence." *GAB Bus. Servs.*,

---

[2] Plaintiff does not contend this is a situation where the relationship attaches as a matter of law, mooting several of Miller's arguments in response. Mot., 7.

1  *Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 417 (2000), as modified (Sept.

2  14, 2000), as modified on denial of reh'g (Sept. 26, 2000), and disapproved of on other grounds by

3  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 95 P.3d 513 (2004) (cleaned up).

4        The existence of a fiduciary relationship undertaken by agreement is a question of fact for

5  the jury. *Barbara A. v. John G.*, 145 Cal. App. 3d 369, 383 (1983); *GAB*, 83 Cal.App.4th at 417.

6        Here, as alleged in the FAC and set out in the relevant contracts, UD carefully selected

7  Miller from a small pool of qualified individuals to act as lead game designer for its next hit TCG

8  in large part because of his expertise and specialized knowledge which UD did not possess. FAC,

9  ¶ 75-77. The parties agreed Miller would keep his design work confidential and not disclose it. *Id.*

10  All works developed by Miller belonged to Upper Deck and Miller agreed to take steps if necessary

11  to confirm that and not to disclose the work to anyone else. ECF No. 48, Ex. 1 at § 5, 7-8 and Ex.

12  2 at § 5, 10. This is all UD needs to show to establish it entered into a confidential relationship

13  with Miller who accepted the confidence UD reposed with him. The jury will ultimately decide

14  whether the relationship qualifies.

15        All a plaintiff needs to allege is that it entrusted the defendant with an important

16  responsibility like the management of investments, and that the defendant accepted that

17  confidence, especially where the defendant had greater expertise in the subject matter like Miller's

18  unique and trusted work as a game designer. *See Johnston v. RealD*, 2014 WL 12686908, at *4

19  (C.D. Cal. Jan. 14, 2014). An adequate claim for breach of fiduciary duty also arose where a home

20  design company hired an independent contractor and trusted him with proprietary development

21  plans which the contractor later converted to his own use. *See Aagard v. Palomar Builders, Inc.*,

22  344 F. Supp. 2d 1211 (E.D. Cal. 2004); and *see*, *e.g.*, *Peter Gellman, et al., v. Andrea Hunsinger,*

23  *et al.*, 2021 WL 4295289, at *6 (S.D. Cal. Sept. 20, 2021) (Upholding an arbitration award under

24  a fiduciary duty theory where the plaintiff had "place[d] trust in the integrity of [an independent

25  contractor].").

26        Miller's arguments miss the mark. First, he ignores that this is a question of fact, not

27  something that can be addressed on an MTD. Mot., 6-9. Next, he focuses primarily on fiduciary

28  duties imposed by law which are not relevant here. *Id*. Finally, he attempts to elevate a few lines

1  in his contract with UD that preclude him from binding UD to third party contracts or obligations

2  over all the allegations in the FAC and the remainder of the several-page contracts between the

3  parties. This narrow view of the parties' relationship misses the forest for a few small trees and

4  fails to meet his burden at this stage on an issue reserved for the jury.

5      Miller's ELR arguments, as they do throughout the MTD, fail here. Defendants argue the

6  economic loss rule bars any non-contract claims in lawsuit involving a contract dispute, but that is

7  not the case as explained above. Furthermore, even were this a case impacted by the ELR, there

8  are "several instances where tort damages [are] permitted in contract cases." *Robinson Helicopter*

9  *Co. v. Dana Corp.*, 34 Cal. 4th 979, 989 (2004). These instances include but are not limited to

10  things like fraud, conversion, and tortious or intentional breaches of contract causing substantial

11  consequential damages. *Id*. at 990. Thus, the ELR does not eliminate claims like breach of

12  fiduciary duty for intentionally failing to honor a contract and depriving the plaintiff of contractual

13  promises like monies owed. *Bentham v. Bingham L. Grp.*, No. 13CV1424-MMA (WVG), 2013

14  WL 12186171, at *12 (S.D. Cal. Nov. 15, 2013); *United Guar. Mortg. Indem. Co. v. Countrywide*

15  *Fin. Corp.*, 660 F. Supp. 2d 1163, 1181 (C.D. Cal. 2009) (". . . exceptions to the economic loss

16  rule [include] breaches a duty imposed by some types of "special" or "confidential" relationships.

17  . . ."). Otherwise stated, "a breach of fiduciary duty claim is precisely the sort of claim that clears

18  the economic loss bar, not one it defeats." *Abrams v. Blackburne & Sons Realty Cap. Corp.*, No.

19  219CV06947CASAS, 2019 WL 8640656, at *16 (C.D. Cal. Dec. 2, 2019).

20      Furthermore, the fiduciary duty claim is not based in contract; it takes aim at a party's

21  misuse of trust placed in them by the other and there need not be any contract at all to pursue this

22  remedy. In other words, the trier of fact may find no breach of contract or no associated damages

23  but still find for UD on the fiduciary claim which seeks remedies beyond those involved in a breach

24  of contract like exemplary and punitive damages as well as attorney's fees. *Compare* FAC, ¶ 79-

25  80 (fiduciary remedies) *with* ¶ 73 (contract remedies). *Albert's Organics, Inc. v. Holzman*, 445 F.

26  Supp. 3d 463, 481 (N.D. Cal. 2020) (where duties are not per se a result of contract, fiduciary

27  claims survive economic loss challenges).

28

3.      *UD Adequately Pleads Fraud.*

Miller's attacks on the fraud claim also fail. First, he claims non-Californians like himself cannot face liability under California's fraud laws even if committed against Californians. Mot., 9. It cites no case limiting California fraud claims in such a manner, only a single unfair competition law case that stands for the unremarkable proposition that California law generally does not aim to protect *non-Californians* from conduct occurring *outside of the state*. *Id.* (*citing Norwest Mortg., Inc. v. Superior Ct*., 72 Cal. App. 4th 214, 222 (1999).) It does not follow that *Californians* like Upper Deck cannot rely on California law to protect themselves from harms occurring in California by non-residents like Miller. Indeed, the California Supreme Court has rejected out-of-state actor's attempts to avoid liability under California laws for actions against California residents merely because they committed the prohibited acts from outside of the state. *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 119, 137 P.3d 914, 931 (2006) ("applying the [California] statute to a multistate event in which a crucial element—the confidential communication by the California resident—occurred in California."); *and see e.g.*, *Gilmore Bank v. AsiaTrust New Zealand Ltd.*, 223 Cal. App. 4th 1558, 1572-76 (2014) (upholding personal jurisdiction in California for a fraud case against a New Zealand defendant based on adequate relevant contacts with California).  Here, Upper Deck was defrauded in California so Miller can be held accountable under California law.

Next, Miller argues that his statements regarding his reason for terminating his contract with UD were not false representations because he did in fact take on full-time employment with Ravensburger. Mot., 10. This misstates the issue and calls for interpreting the allegations favorably to Miller. The FAC alleges that Miller represented to several UD employees that his motivation in terminating their relationship was to pursue full-time employment, but his actual reason was to go work for a competitor creating a competing game using the work UD paid him to develop. FAC, ¶¶ 83-85, 87. Thus, the false representation was Miller's motivation for leaving UD – he claimed it was for employment benefits when in fact it was so he could go work on a competing TCG using UD's property. The fact that Ravensburger hired him as a full-time employee is not the relevant

1     inquiry; it is his motivation for leaving UD to go there which he falsely represented with the desire

2     for full-time employment serving as a false cover.

3         Whether Miller's statements were adequate misrepresentations is an issue for the trier of

4     fact making pleadings-stage arguments about the actual intent or construction of a defendant's

5     statements improper. *See*, *e.g.*, *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1061 (2012)

6     ("[Defendant] is essentially arguing that [Plaintiff] misunderstood her statements and

7     misconstrued her intent. However, fraudulent intent is an issue for the trier of fact to decide.")

8     (cleaned up).

9         Next, Miller takes several passing shots at the concealment theory. Mot., 10-12. He first

10     claims there is no legal duty to disclose his future employment plans citing only to a generic

11     authority spelling out the elements of this claim and no on-point case law. Mot., 10-11. Not true

12     for two reasons. Initially, as noted above (Section III(D)(2)), Miller was a fiduciary given the trust

13     UD placed in him as lead game designer and his confidentiality obligations. Further still, even

14     without such a relationship, "a non-disclosure claim arises when the defendant makes

15     representations but fails to disclose additional facts which materially qualify the facts disclosed."

16     *Roddenberry v. Roddenberry*, 44 Cal. App. 4th 634, 666 (1996). Otherwise stated, if one speaks at

17     all, they must make a full and fair disclosure. *Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal.

18     App. 4th 603, 613 (1992). As with misrepresentations, a duty to disclose and concealment are

19     questions for the trier of fact. *Id.* at 614. UD alleges that Miller made misleading, deceptive partial

20     disclosures regarding the reason for terminating his contract without fully explaining his plans to

21     go work on a competing TCG. FAC, ¶ 85. When terminating his contract, Miller chose to partially

22     explain himself but did not do so fully or fairly.

23         Miller also contends that UD must have known Miller would go do game design work after

24     leaving UD (FAC, ¶ 38), but, as UD alleges, Ravensburger is not a TCG company and had not

25     made such games before. Additionally, Miller's work is not confined to TCGs, so it is not so

26     obvious this would occur, nor is Miller entitled to bend facts in his favor at this stage of the case.

27     FAC, ¶¶ 84-86.

28

OPPOSITION TO MOTION TO DISMISS FIRST        Nicholas & Tomasevic, LLP
AMENDED COMPLAINT (2:23-cv-01936-KKE) – 11     225 Broadway, 19th Floor, San Diego, CA 92101
Tel: (619) 325-0492 | Fax: (619) 325-0496

1    Miller also argues he is free to pursue other work (Mot., 11) which may be true, but he

2    cannot mislead UD with half-truths about the nature of that work and the reason for his departure

3    so that he can take UD's property and avoid suspicion.

4    He also asserts that UD cannot credibly allege it would have acted differently had it learned

5    of Miller's work for Ravensburger earlier in time. Mot., 11-12. Like nearly all Miller's attacks,

6    this reframes the well-pleaded facts and asks for inferences to be drawn in his favor. It also ignores

7    common sense – by the time UD learned of the issue when Lorcana went public, it was too late to

8    demand return of materials and insist on confidentiality; the damage was done. FAC, ¶¶ 88-92.

9    Miller concludes with a brief ELR argument. Mot., 12. However, as *Robinson* holds, "the

10    economic loss rule does not bar [plaintiff's] fraud and intentional misrepresentation claims because

11    they were independent of [defendant's] breach of contract." *Robinson Helicopter*, 34 Cal. 4th at

12    991. There, the defendant helicopter part supply company engaged a new manufacturer for parts

13    and did not advise the plaintiff of the change which was contractually required and provided false

14    certificates of compliance regarding their manufacturing process. The California Supreme Court

15    found this sufficiently distinct from a contract to give rise to a separate tort claim. *Id.* at 990-991.

16    So, too, here. Contractually, while Miller owed a contractual duty not to disclose his work for UD,

17    there was no contractual requirement for Miller to explain his motivation for terminating the

18    contract or make any statements about what he would be doing next, but he chose to do so in a

19    false and misleading way which is separate from any contract claim. Public policy favors this

20    result. *Id.* at 991-992.

21    *4.    UD's Inducing Breach of Contract Claim Survives.*

22    Ravensburger takes a few swipes at UD's claim for inducing breach of contract. Mot., 12-

23    14. Its first argument is that there are inadequate allegations of Ravensburger's knowledge of the

24    UD-Miller contracts. *Id*. Not true. The FAC alleges that Ravensburger knew of the UD-Miller

25    agreements based on its hiring process which would include things like creating a process for

26    discussing potential use of confidential, proprietary, or trade secret information in performing

27    work for Ravensburger and identifying the existence of any kinds of confidentiality or restrictive

28    covenants of new employees like Miller. FAC, ¶ 97(c), (e). This is especially true for a company

1    hiring away a freelance worker from a competitor known for creating TCGs to come and design

2    Ravensburger's first TCG. *Id*., at ¶ 98. The small nature of the gaming industry and Ravensburger's

3    close proximity to Miller and history of working with him further indicate that Ravensburger knew

4    that Miller was designing a TCG for UD when they hired him. *Id*., at ¶ 99.

5         Ravensburger's arguments ignore and water down all of these allegations and instead ask

6    the Court to bend facts in its favor. Ravensburger falsely states there are no allegations: that it

7    knew of any Miller-UD contract (*compare* Mot., 13 *with* FAC, ¶¶ 97-98 [alleging knowledge of

8    the two contracts as a result of its hiring and due diligence process]), or that Ravensburger had a

9    hiring process (*compare* Mot., 13 *with* FAC, ¶¶ 97-98 [alleging Ravensburger had such a process]).

10   Ravensburger then reads one subsection (b) of FAC paragraph 97 to the exclusion of the remaining

11   subsections. Mot., 13:6-11. Creatively reframing a complaint by eliminating certain allegations

12   and narrowing others does not entitle a party to dismiss claims.

13        Ravensburger also asks the Court to read the confidentiality language in the Miller-UD

14   agreements to prohibit any disclosure of Miller's relationship with UD to Ravensburger, but this

15   again ignores allegations and asks the Court to interpret facts in Ravensburger's favor. Mot., 13.

16   Certainly, Miller could alert Ravensburger to who he worked for and what kinds of general projects

17   he worked on without giving away any substantive UD secrets.

18        Defendant next argues that "should have known" is not enough, but it ignores that, in

19   addition to pleading what Ravensburger should have known, UD also alleges that it did know.

20   Mot., 13-14; FAC, ¶¶ 97-98. Nor is Upper Deck imputing knowledge of unidentified contracts

21   onto Ravensburger. *Compare id. with* Mot., 13:17-20.

22        The second argument is largely the same – it ignores allegations and skews the facts. Mot.,

23   14. Ravensburger claims there are no allegations regarding what it did to induce a breach. *Id*. While

24   hiring away, in isolation, is not actionable as Defendant notes, doing so to obtain a competitor's

25   confidential work product and beat them to market certainly is. FAC, ¶¶ 100-102. Wanting to jump

26   the line and fast-track a TCG, Ravensburger asked Miller to design Lorcana capitalizing off his

27   work for UD and materials he possessed from that work. *Id*.

28

1          *5.     Upper  Deck  Adequately  Pleads  Intentional  Interference  against*

2                  *Ravensburger.*

3          Ravensburger makes several unavailing attempts to dismiss the intentional interference

4   with prospective economic relations claim. Mot., 15-16. Its first argument asserts that the only

5   alleged "wrongful act" is the hiring of Miller. *Id*. This is false. UD alleges that the "wrong" at issue

6   is the purpose for which Ravensburger hired him – to "use the confidential, proprietary drafts and

7   other work product developed by Upper Deck and Miller for Rush of Ikorr to develop the

8   competing Lorcana game." FAC, ¶ 108. By failing to address this allegation and instead creating

9   a straw man to argue against, Ravensburger's argument fails.

10         Copyright preemption does not bar this claim either. Mot., 14. Copyright preemption asks

11  (1) if the subject matter of the other claim falls within the subject matter of copyright law, and (2)

12  whether the other rights asserted are equivalent to the exclusive rights available under the copyright

13  laws. *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1010 (9th Cir. 2017). Both steps prevent

14  preemption.

15         As to (1), it is odd for Defendants to, on the one hand, claim there is no copyright protection

16  for Plaintiff's works (Mot., 17-19), but on the other hand claim the intentional interference claim

17  covers the same subject matter as things copyright law aims to protect. In short, if Defendants are

18  correct that there is no copyright protection available, it makes no sense to dispense of this claim

19  on preemption grounds under step (1). As such, UD pleads this cause of action in the alternative

20  at this stage and if the Court or a jury finds for copyright protection at the appropriate stage, this

21  claim will no longer meet step (1), but it does for now. *See, e.g.*, *Sleep Sci. Partners v. Lieberman*,

22  No. 09-04200 CW, 2010 WL 1881770, *5 (N.D. Cal. May 10, 2010) ("Although it has not said so

23  explicitly, Plaintiff may have plead its trade dress claim in the alternative, accounting for a

24  possibility that its website may not be copyrightable."). Furthermore, in *Smith v. Weeknd*, the court

25  originally dismissed without prejudice state law claims that overlapped with copyright claims but

26  allowed amended pleadings to stand where the Plaintiff alleged in the alternative that it may not

27  have viable copyright claims to pursue depending on how the facts develop in the case. *See Smith*

28  *v. Weeknd*, 2019 WL 6998666, at *6 (C.D. Cal. Aug. 23, 2019) (finding it possible to plead state

1  law claims in the alternative where it is possible no copyright claim exists); and *Smith v. Weeknd*,

2  2019 WL 6998777, at *2 (C.D. Cal. Nov. 6, 2019) (on amendment to include alternative

3  allegations, letting both state law and copyright claims proceed in the alternative).

4      With respect to (2), other rights are at issue here beyond mere copying. Courts find that

5  claims that take aim at a defendant saturating the market and lessening the value of the works to

6  the plaintiff are not copyright preempted. *Brackett v. Hilton Hotels Corp.*, 619 F. Supp. 2d 810,

7  822 (N.D. Cal. 2008) (unauthorized prints of a painting not only infringed on the copyright

8  entitlement to reproduce the work but interfered with customer demand and satisfaction with the

9  works). Similarly, "disrupt[ing] contractual and business associations" go beyond mere copyright

10  claims. *N. Star Media, LLC v. Winogradsky-Sobel*, 2011 WL 13220157, at *9 (C.D. Cal. May 23,

11  2011).

12      So, too, here. This case is not just about copyrighted works being reproduced for

13  Defendants' benefit. Instead, UD sought to restrict the use of its confidential game and

14  development of its game via its contracts with Miller. Yet, Ravensburger intentionally disrupted

15  UD's ability to limit the use and distribution of the game designs by hiring Miller so that it could

16  use UD's confidential materials for its own purpose and to beat UD to a limited TCG market. FAC,

17  ¶¶ 92, 100, 109. UD has now lost control of its work product and its ability to, for example, make

18  certain cards or packs "rare" and drive their value. *Id.* Similar "intentional interference claims

19  based on [] 'sole use' provision[s]" survive copyright preemption arguments because they go

20  beyond the mere reproduction or copying of another's copyrighted works and instead interfere

21  with the plaintiff's customers and markets. *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089

22  (9th Cir. 2005). Otherwise stated, the interference with the right to limit the use of a work is distinct

23  from infringing on a copyrighted work. *Wilder v. CBS Corp.*, No. 2:12-CV-8961-SVW-RZ, 2016

24  WL 693070, at *7 (C.D. Cal. Feb. 13, 2016). That is what this interference claim is about.

25      UD also alleges more than a mere hope of future success that was disrupted by Defendants'

26  conduct. Mot., 16. UD has a long history of developing and launching successful, popular TCGs

27  with Rush of Ikorr being its current work-in-progress. FAC, ¶¶ 21-22. With Miller's assistance,

28  UD completed various milestones and expansions of the game and has filed for and received

1  copyright protection for several aspects of its game. *Id.*, at ¶¶ 29-30, 114. Accepting these facts as

2  true and interpreting reasonable inferences in UD's favor demonstrates that, consistent with its

3  long track record in the TCG category, UD had a reasonably probable economic prospect that

4  Defendants disrupted. The "nothing but a hope" argument is inconsistent with the allegations and

5  interprets things against Plaintiff.

6      Lastly, as addressed in Section III(D)(4), UD adequately pleads Ravensburger had

7  knowledge of the contract and the broader relationship between Miller and UD at the time it hired

8  him to come and work on its competing game. Mot., 16 (arguing to the contrary).

9          *6.     Copyright Claims Are Adequately Stated Also.*

10     As with other causes of action, Defendants make a series of unsupported and meandering

11  arguments seeking to dismiss UD's copyright claim.

12     Defendants' initial arguments take aim at whether UD adequately alleges that Lorcana

13  game copies non-functional, expressive elements of UD's copyrighted works such that there is

14  "substantial similarity" between the two. Mot., 17-18, and *see, e.g., Mattel, Inc. v. MGA*

15  *Entertainment, Inc.*, 616 F.3d 904, 913–14 (9th Cir. 2010) (discussing relevant standard). It does.

16  FAC, ¶¶ 113-118. UD owns two copyrights which it identifies by registration number[3] that make

17  up working drafts of its trading card game Rush of Ikorr. *Id.*, at ¶ 114. UD then lists several non-

18  exhaustive examples of the creative and expressive elements of its TCG that Defendants copied in

19  Lorcana citing the exact copyrighted text at issue in a side-by-side comparison to the Lorcana

20  game. *Id.*, at ¶ 116.

21     Rather than attack these well-pleaded similarities or explain why they are deficient,

22  Defendants change the subject and make erroneous arguments such as UD must attach the

23  copyrighted works to the FAC or provide discovery to Defendants at this stage. Mot., 18. They

24  also suggest that UD's pleadings falsely allege the nature of the copyrighted materials. *Id.* Not so.

25  *See, e.g., Nintendo of Am., Inc. v. Storman*, 2020 WL 2463374, at *2 (C.D. Cal. Jan. 15, 2020)

26  ("[T]he Complaint adequately alleges ownership by alleging Plaintiff holds registered copyrights

27

28  _____
[3] UD need not attach its filings to the FAC as Defendants appear to suggest without any supporting
   authority. Mot., 17-18.

1    for the subject works and identifying the copyright registration number and date for those works.”);

2    and *Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.*, 149 F. Supp. 3d 1167, 1175 (N.D. Cal.

3    2015) (citing 3 M. & D. Nimmer, *Nimmer on Copyright* § 12.09[A][2] (Rev. Ed.)) (no need to

4    specify every instance of copying at the pleadings stage).

5        Defendants' feigned misunderstandings of the FAC continue as they argue that UD does

6    not quote any text from a trading card despite examples of exact quotes appearing in the FAC.

7    *Compare* FAC, ¶ 116 (providing direct quotes of text from the copyrighted materials) *with* Mot.,

8    17-18 (claiming no text is quoted).

9        Next, while not disputing there are substantial similarities between the two games as cited

10    in the FAC, Defendants dismiss the examples of overlapping descriptions of character abilities and

11    expressive game effects as non-copyright-protectable "mechanics." Mot., 18-19. This is wrong for

12    several reasons.

13        Plaintiff agrees that under the usual idea-expression backdrop of any copyright case, game

14    rules and other mechanics are not protected. This is why the copyright cause of action does not

15    take issue with the entire gameplay loop of Lorcana even though it is very similar to Rush of Ikorr

16    (FAC, ¶ 44-68), but instead focuses on more narrow, expressive elements within the game that are

17    substantially similar like the specific names and descriptions of characters' abilities. FAC, ¶ 116.

18    There is a distinct, two-part test used in this Circuit to determine if there is substantial similarity

19    of protectable expression.[4] Defendants appear to take aim at the first part of the test that involves

20    analytic dissection of unprotectable ideas from protectable expression within a game, often using

21    expert testimony, so the Court can determine whether any of the allegedly similar features are

22    copyright protected. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994);

23    *Famous Birthdays, LLC v. SocialEdge, Inc.*, 2022 WL 1591723, at *3 (C.D. Cal. Apr. 15, 2022).

24    Within this analysis, the Court must determine if the possible range of expression in the given

25    medium is broad or thin to assess how much protection expression will receive. *Mattel*, 616 F.3d

26    at 914-915.

27

28    _____

[4] The second part of this test focusing on the intrinsic features of the work does not appear to be at issue and is a matter reserved for the jury in any case.

OPPOSITION TO MOTION TO DISMISS FIRST        Nicholas & Tomasevic, LLP
AMENDED COMPLAINT (2:23-cv-01936-KKE) – 17    225 Broadway, 19th Floor, San Diego, CA 92101
Tel: (619) 325-0492 | Fax: (619) 325-0496

This detailed and often expert driven analysis is poorly suited for a pleadings stage challenge. *See*, *e.g.*, *Famous Birthdays*, 2022 WL 1591723, at *5 ("Based on the limited record and the scope of Plaintiff's infringement claim [at the motion to dismiss phase], the Court cannot determine whether, as a matter of law, the substantial similarity test has been met."). Defendants' primary reliance on summary judgment cases decided on a full record like *Ziko Games* highlights this.

Furthermore, Defendants' short-shift analysis of these complex issues fails to meet its burden here to the extent the Court will entertain this argument at this stage. Rather than take on the multitude of examples in the FAC of direct copying of character ability names and descriptions that are identical or near-identical between the two games or address each creative game feature that the two games share, Defendants discuss only a few and do so in a misleading way. Mot., 18-19.

As to the exemplar overlapping character abilities and descriptions set out in the FAC (¶ 116(a)), UD demonstrates that characters in both games are given identical or near-identical ability names and descriptions. For example, Lorcana changes the "Elusive" ability to a sound-alike synonym "Evasive" and describes the ability in near-identical terms. *Id.* The games also share Support, Bodyguard, and Charge/Rush character abilities with near-identical descriptions. *Id.* There are many creative options available to game designers looking to give characters unique strengths and weaknesses and there is no need for the names of the abilities to be near-identical or for similarly named abilities to be described in an almost identical way. For example, a TCG manufacturer could name a card elusive/evasive but give it a different ability like never being attacked, not being attacked on certain turns, or not being attacked a set number of times at the player's option. Or the manufacturer could call the card ability by any number of non-similar names, but calling abilities by similar sounding or exact same names and then giving those abilities near-identical descriptions amounts to copying of protectable expression as UD will prove on a full record with the support of an expert witness at a later stage.

Defendants' own authorities recognize that "expressive aspects of the game's characters" including a "characters' fanciful special moves [such as] slapp[ing] opponents repeatedly at a

1   humanly impossible speed" are "expressive because its design was limited only by the game

2   developer's imagination." *Davinci Editrice S.R.L. v. ZiKo Games, LLC*, 183 F. Supp. 3d 820, 831

3   and 833 (S.D. Tex. 2016). The PAC-MAN case is the same. While earning points by navigating a

4   maze being chased by opponents, much like using trading cards to race to score points, is an

5   unprotected "idea," the expression of the game's central characters nonetheless received

6   protection. *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 617 (7th Cir. 1982).

7   That court looked at the different ways a creator can express a maze-chase game and found the use

8   of similar "gobbler" and "ghost monster" characters protectable expression. *Id*. at 617-618. As that

9   court noted, the defendant's game "not only adopted the same basic characters but also portrayed

10  them in a manner which made [the game] appear substantially similar to PAC-MAN." *Id*. at 618;

11  and *see Spry Fox LLC v. LOLApps Inc.*, 2012 WL 5290158, at *6 (W.D. Wash. Sept. 18, 2012)

12  (creative language to express game rules is entitled to protection against near identical copying).

13          The other alleged expressive game effects also warrant denial of the MTD. FAC, ¶ 116(b).

14  There are a host of options available to TCG designers for how to structure decks of cards used to

15  play the game, but Lorana directly copies the creative limiting deck parameters by introducing

16  cards in various colors and limiting players to only two colors per deck along with other "loyal"

17  based possible advantages. *Id.* Resources needed to play cards or make moves within a game can

18  also come from a variety of sources, but Lorcana directly lifts the discard-pile based resource set

19  up from Rush of Ikorr. UD's claim is not that Lorcana cannot use decks or resources, but that

20  structuring deck building and resource elements of a game are creative decisions that Lorcana lifts

21  from UD's game in a near-identical way. Thus, this not a case where the character manes or

22  functions are "generic" like in *Ziko Games* where the ability was merely to attack from a long

23  range or for a chess piece to move longer distances. Using the elusive/evasive example, if both

24  games had dissimilarly named characters that had some feature limiting their ability to be attacked,

25  Defendants' argument might make sense, but the name given to the ability and the description of

26  the ability at issue here is uniquely expressive of the limited attack feature from many options and

27  they are nearly-identical in both games warranting denial of the MTD and further development of

28  these issues.

1    Defendants' "character" defense fairs no better. UD does not seek to protect any animated

2    or other physical "character" – it is the creative and expressive character abilities and names of

3    those abilities that UD takes issue with because of the direct, near-identical copying. *Compare*

4    Mot., 19 (addressing characters) *with* FAC, ¶ 116 (discussing expressive character abilities and

5    game effects).

6    Finally, Defendants claim, without a record cite, that there is no direct infringement. Mot,

7    19:25-26. It is unclear what this means as UD alleges that Ravensburger has directly created and

8    sold the Lorcana product. This is not an instance in which Defendants are a sharing-enabling

9    platform like Napster.

10          *7.      UD Adequately Pleads the Conversion Claim.*

11   UD alleges that it was the lawful owner of certain game designs and did not authorize

12   Miller to take these designs for use in developing Lorcana at Ravensburger. FAC, ¶¶ 119-124. A

13   conversion claims lies for intangible property like customer lists or confidential information. *See*

14   *Kremen v. Cohen*, 337 F.3d 1024, 1032 (9th Cir. 2003) (collecting and summarizing conversion

15   cases); *Best Carpet Values, Inc. v. Google LLC*, No. 5:20-CV-04700-EJD, 2021 WL 4355337, at

16   *4 (N.D. Cal. Sept. 24, 2021) ("conversion is a remedy for conversion of 'every species of personal

17   property,' whether tangible or intangible.") (citing *Kremen*).

18   Thus, Defendants' first argument that mere "ideas" floating in the air are not protected by

19   conversion fail as this is not UD's theory of this cause of action. Mot., 20 (arguing that ideas like

20   one for a movie plot that is not yet set out in any script or other document are not protected by

21   conversion).

22   The economic loss rule does not assist Defendant Miller because UD's right to its game

23   designs and Miller's related duty not to take these documents and designs go beyond the contract

24   with Miller. As *Robinson Helicopter* explains, "a tortious breach of contract may be found when .

25   . . the breach is accompanied by a traditional common law tort, such as fraud or conversion . . .

26   [e.g.] when some independent duty arising from tort law is violated." 34 Cal.4th at 990. Thus,

27   where a contract calls for one party to be entrusted with a business plan or money of another, the

28   property interest of that party gives rise to a tort claim for conversion because, even without the

contract, the property interest and duty not to take something not belonging to the plaintiff remain. *Fine v. Kansas City Life Ins. Co.*, 627 F. Supp. 3d 1153, 1162 (C.D. Cal. 2022) (summarizing cases).

Copyright preemption also fails. Like with the intentional interference claim (subsection (5) above), this claim is broader and not preempted. Additionally, UD pleads the conversion claim in the alternative in case it does not have an operative copyright cause of action.

### 8. *Defendants' UCL Attacks Also Fail.*

Defendants lob in a few more inapt challenges to the final UCL cause of action. They claim they do not know whether the alleged acts at issue in this case are unlawful, unfair, or fraudulent, but that is not true. Mot., 21. The derivative Eighth Cause of Action incorporates the earlier allegations by reference and each preceding cause of action makes clear that the conduct at issue is illegal (i.e. violates some law) and/or fraudulent (for the fraud cause of action). FAC, ¶ 125.

Defendants also take aim at the relief sought. Mot., 21. As an initial matter, UD seeks injunctive relief, FAC, ¶ 127, and this is the main remedy available under the UCL in addition to restitution. *See* Cal. Bus. & Prof. Code, § 17203. Plaintiff agrees that disgorgement is not available under the UCL and is amenable to removing that remedy under the UCL cause of action.

Finally, UD also agrees that it cannot recover under the UCL for copyright violations but intends to retain this cause of action for the other illegal acts at issue in the case beyond copyright.

### 9. *UD Seeks Leave to Amend.*

While UD believes all arguments in the MTD are meritless, if the Court agrees with any of Defendants' merits attacks, it seeks leave to amend to try to cure these defects given that this is the first time the Court will weigh in on their adequacy.

## IV.   <u>CONCLUSION</u>

The Court should apply California law and reject the various pleadings attacks lodged by Defendants.

1

## **LCR 7(e)(6) CERTIFICATION**

2

I certify that this memorandum contains 8,261 words, in compliance with the Local Civil

3

Rules.

4

Respectfully submitted:

Dated:  February 15, 2024

5

**NICHOLAS & TOMASEVIC, LLP**

6

By:    _/s/ Shaun Markley_

Craig M. Nicholas (CA SBN 178444)*

7

Shaun Markley (CA SBN 291785)*

Jordan Belcastro (CA SBN 339570)*

8

225 Broadway, 19th Floor

San Diego, California 92101

9

Tel: (619) 325-0492 | Fax: (619) 325-0496

Email: cnicholas@nicholaslaw.org

10

Email: smarkley@nicholaslaw.org

Email: jbelcastro@nicholaslaw.org

11

Attorneys for Plaintiff,

12

THE UPPER DECK COMPANY

13

*Pro hac vice*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28