1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE UPPER DECK COMPANY,

                 Plaintiff(s),

    v.

RYAN MILTON, et al.,

              Defendant(s).

CASE NO. C23-1936-KKE

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Plaintiff The Upper Deck Company ("Upper Deck") sued its former contractor, Ryan Miller ("Miller")[1], and its competitor, Ravensburger North America Inc. ("Ravensburger"), for claims arising from the alleged copying of Upper Deck's new trading card game ("TCG"), Rush of Ikorr. Upper Deck alleges that after working on the early development of Rush of Ikorr, Miller took Upper Deck's intellectual property related to the game and went to work for Ravensburger, where he applied Upper Deck's confidential game design to Ravensburger's new TCG, called Lorcana. After two rounds of motions to dismiss, Upper Deck's remaining claims include copyright infringement, breach of contract, fraud, conversion, and violations of California's Unfair Competition Law ("UCL"). Dkt. No. 83 ("TAC") at 11–17. Defendants now move for summary judgment on all claims. Dkt. No. 122.

---

[1] Ryan Miller subsequently changed his name to Ryan Milton. At oral argument, the parties expressed their preference to refer to him using his previous surname, "Miller."

The Court heard oral argument on this motion on September 4, 2025. Dkt. No. 170. As detailed below, Upper Deck's copyright, fraud, conversion, and UCL claims fail as a matter of law, and thus the Court grants summary judgment as to these claims and dismisses Ravensburger as a defendant. Genuine disputes of material fact preclude summary judgment on Upper Deck's breach of contract claim against Miller. Thus, the motion is denied as to that claim alone.

## I.    BACKGROUND

In December 2018, when Miller was working as a freelance game designer, Upper Deck invited him to attend a gaming summit to generate ideas for a new TCG. Dkt. No. 83 ¶ 11; Dkt. No. 179 at 6. Under an agreement ("2018 Agreement"), Miller was paid to contribute to the design and creation of new games at the summit. Dkt. No. 179 at 6–10. On June 24, 2019, Miller entered into a Work for Hire agreement with Upper Deck ("2019 Agreement"), under which Miller began formal development of the TCG currently known as Rush of Ikorr.[2] *Id.* at 62–71. Under the 2019 Agreement, Miller was to "create the initial theme of [the game], develop basic game mechanics, provide a single player demonstration deck with between 20-30 cards to convey the Product's design, and to use his best efforts to contribute ideas, concepts, designs, and feedback related to the design, mechanics, and creation of the products[.]" *Id.* at 62. The 2019 Agreement outlined a series of milestones for the development of the game. For each milestone completed, Upper Deck would pay Miller a fixed sum. *Id.* at 62–63.

Under the 2019 Agreement, Miller also agreed that "[a]ll rights, title, and interest" in products including "plans, outlines, sketches, copy, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, designs, blueprints, photographs, transparencies, mechanicals, reproductions, and all property and materials produced or acquired

---

[2] Upper Deck first named the TCG now known as Rush of Ikorr "Shell Beach." Dkt. No. 179 at 50. Miller re-named the project "Pantheon." *Id.* The game was later re-named Rush of Ikorr. *Id.*

by or for [Miller]" as part of his design work for Upper Deck belonged solely to Upper Deck. *Id.* at 63. The 2019 Agreement further prohibited the disclosure of confidential information to "any third party" for two years following termination or expiration of the contract. *Id.* Under the 2019 Agreement, confidential information included "without limitation, this Agreement and information regarding [Upper Deck's], its affiliates', and licensors' financials, intellectual property (whether or not issued), customers, products, releases, investments, marketing and/or business plans and strategies, pricing, partners, management, plans, technologies, and techniques," but excluded "any information that [] is or becomes publicly known." *Id.* at 65–66.

In addition to defining protected work, the 2019 Agreement set limitations on Miller's use of the materials he produced. While Upper Deck fully retained "the right to use, sell, give away, or otherwise distribute the Works, and any derivative thereof, at any time during and after the Term [of the contract], in any manner and for any purpose," Upper Deck permitted Miller to "display designs" from his work for self-promotional purposes only when the final game had been released to the public. *Id.* at 64. The 2019 Agreement specified that "any Display before [Upper Deck's] public release of the Products will be deemed a material breach[.]" *Id.* at 64.

Notwithstanding the above, the 2019 Agreement contained no limitations on Miller's ability to work for other game designers while working for Upper Deck. In fact, Upper Deck expected that Miller would be freelancing for multiple companies at once given the relatively low pay for freelance work. Dkt. No. 159 at 147. During this time, in early to mid-2020, Miller engaged in freelance work for both Upper Deck and Ravensburger. Dkt. No. 182 at 81–82. Between September and October 2020, Miller's work at Ravensburger included some work on the Lorcana project, though his work at this time was limited to setting up a card-making database, and did not include substantive game design. *Id.* at 89–92.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 3

In March 2020, Miller provided Upper Deck with Version 2.6 of the Upper Deck TCG ("Version 2.6"), known then as "Pantheon." Dkt. No. 132. Version 2.6 included two pages entitled "Pantheon Rules v.2.6 Rules" and three card decks consisting of approximately 100 cards. *Id.* at 4–37. On October 21, 2020, after completing the first four milestones and part of the fifth milestone (Dkt. No. 179 at 55–56), Miller terminated the 2019 Agreement with Upper Deck. *Id.* at 39, 51–53. In October 2020, Miller told Upper Deck that he was leaving to work full time at Ravensburger, as he needed more stable full-time employment and health benefits. *Id.* at 51–52.

Around November 2020, Miller handed off all Pantheon project files to Luke Peterschmidt, a fellow freelance game designer who Miller had recommended to Upper Deck as his replacement on the Pantheon project. Dkt. No. 179 at 596–97; Dkt. No. 181 at 147–48. That version included three decks of cards called "Paladin," "Monk," and "Mage." Dkt. No. 181 at 72–73. These files also included the Version 2.6 Rules, which were delivered to Upper Deck upon Miller's departure from the company. Dkt. No. 181 at 58–60.

Miller started working full time for Ravensburger on November 9, 2020. Dkt. No. 179 at 621. Ravensburger publicly announced the creation of Lorcana in the fall of 2022, published the initial set of rules in spring 2023, and released the full game in August 2023. *Id.* at 213–17. In June 2023, Upper Deck registered two copyrights related to the Rush of Ikorr TCG for "text, 2-D artwork" (Dkt. No. 49 at 5, 7): the first for a 2020 draft version, and the second for a 2023 version of the game. Dkt. No. 83 at ¶ 75. After making further changes to the game, Upper Deck released Rush of Ikorr in June 2025. Dkt. No. 179 at 604.

## A.    Upper Deck's Version 2.6

Rush of Ikorr is a TCG that features references to magic and ancient mythology, and can be played as a one-on-one or a "3 v 3" team experience. *See* Dkt. No. 132. To win, players must collect five gems amid game play that includes the summoning of creatures, spells, attacks, and

raids. *Id.* at 5. Version 2.6[3] consists of two pages of instructions, as well as three decks of approximately 100 total cards, which come in five different colors. Dkt. No. 132 at 4–37. There are four card types: "Class[,]" "Creature[,]" "Overlay[,]" and "Spell." *Id.* at 4. Each "creature" can be combined with one "overlay." *Id.* The overlay adds certain strengths and abilities—but the overlay "cost" must not exceed the creature's overlay "points," and the overlay color must match that of the creature. *Id.* The game begins with each player placing their "class" card face up in front of them, shuffling their deck of cards, then drawing five cards. *Id.* at 5. A pile of "gem counters" is placed nearby, and a first player is randomly selected. *Id.*

The game's objective is to "[h]arvest the gems" on creatures—a player who obtains five or more gems wins. *Id.* During the main phase of the game, players may either summon creatures, play spells, attack with creatures, or raid with creatures. *Id.* "Class" cards restrict the colors a player may include in their decks, and "each class has a pair of buff abilities." *Id.* Playing "buff abilities" is color-restricted, and players must "pay the additional mana cost of the buff." *Id.* Version 2.6 sets out a series of buff abilities, including:

1. Triggers
2. Mastery
3. Familiar
4. Immortal
5. Bodyguard
6. Poison
7. Impervious
8. Elusive
9. Sneak Attack
10. Brave
11. Defender
12. Raider

---

[3] In its TAC, Upper Deck describes the version of Rush of Ikorr that existed at the time of filing in December 2024. Dkt. No. 83 at ¶¶ 30–42. Miller stopped work on the Rush of Ikorr game when it was in its "Version 2.6" form. Thus, the appropriate comparator for the purposes of copyright infringement and breach of contract is the Version 2.6 form of the game. Relatedly, in opposing summary judgment, Upper Deck points to a gamer's public review of Rush of Ikorr that "really [Rush of Ikorr is] just Lorcana," (Dkt. No. 148 at 26) but such a comparison is irrelevant when the appropriate comparator is Version 2.6 of Rush of Ikorr, not the version that was released to the public in June 2025.

13. Armor N

*Id.* Version 2.6 contains three card decks that each featured two colors: a red and grey deck, a red and green deck, and a blue and purple deck. *Id.* at 6–37. Each deck includes one Class card, as well as several Creature, Spell, and Overlay cards. *Id.* The cards lack any illustrations or photographs, but include a name (e.g., "Devil" and "Ogre" for Creature cards; "Enlighten" and "Battle Cry" for Spell cards; "Monk" and "Paladin" for Class cards; and "Aegis Wand" and "Crown of Leaves" for Overlay cards), and sometimes a brief description. *See id.* Several cards contain no descriptions. *See id.* In each deck, there are approximately the same number of overlay cards as there are creature cards.

## B.    Ravensburger's Lorcana

Lorcana is a TCG that features Disney characters (Dkt. No. 179 at 338) and can be played one-on-one or with multiple players. Dkt. No. 123 at 8–9; Dkt. No. 182 at 271. The objective of Lorcana is to win "Lore" through questing, and the first player to gain twenty Lore wins the game. Dkt. No. 182 at 263. Players begin by building a deck of at least 60 cards—each deck can contain only two colors from six available colors: yellow, green, blue, purple, red, and grey. *Id.* at 271. There are four card types—Characters, Items, Actions, and Songs—and cards contain abilities and effects. *Id.* at 263–72. Lorcana cards incorporate Disney characters artwork, as well as references to Disney songs and themes. *See* Dkt. No. 122 at 7. Lorcana's cards have "abilities[,]" most of which "have names that are unique to the card they are printed on." Dkt. No. 182 at 268 (providing examples such as "Kuzco – Temperamental Emperor's ability called 'No Touchy!'"). The non-character-specific Lorcana abilities include:

1. Bodyguard
2. Challenger
3. Evasive
4. Reckless
5. Rush

6.  Shift
7.  Sing
8.  Support
9.  Ward

*Id.* at 267–71.

Once a deck is built, each player takes on the role of an avatar "Illumineer" Disney character. *Id.* at 263. Each player draws seven cards to their hand, and at each turn, a player draws an additional card. *Id.* at 265. During a turn, a player may put a card face down into the "Inkwell." *Id.* at 265–66. To play a card, players must have the requisite number of "Inks" from the "Inkwell." *Id.* at 266. The number of Inks required to play a card is based on the "Cost" indicated on the playing card. *Id.* During the "Main Phase" of the game, players can use Ink to summon a card, activate a card's ability, or challenge a questing enemy. *Id.* at 265–66. Players can also send their characters on quests to gain Lore. *Id.* at 266–67. The number of Lore earned is determined by the Lore Value. *Id.* Characters are vulnerable to challenges while questing. *Id.* at 267.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the case's outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmovant. *Id.* The movant bears the initial burden of showing that there is no genuine issue of material fact and that they are entitled to prevail as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its burden, the non-movant must show there is a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Courts must "view the facts and

draw reasonable inferences in the light most favorable to the [non-movant]." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation modified).

## III.   DISCUSSION

**A.    The Court Grants Defendants' Motion on the Copyright Infringement Claims Against Miller and Ravensburger.**

"Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated." 17 U.S.C. § 102(a). But "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).

Upper Deck alleges that Miller and Ravensburger infringed its copyrights in Rush of Ikorr by copying protected elements of the game and using them in Lorcana. To show copyright infringement, Upper Deck must demonstrate both that (1) Upper Deck owns a valid copyright; and (2) Ravensburger and Miller "copied protected aspects of the work." *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020). "In judicial proceedings, a certificate of copyright registration constitutes *prima facie* evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid." *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104, 1106 (9th Cir. 1990). Because Defendants do not challenge the validity of Upper Deck's copyright, and because Upper Deck has certificates of copyright registration for the 2020 and 2023 versions of Rush of Ikorr, the Court finds Upper Deck satisfies the first prong. Dkt. No. 122 at 27, n.5.

The second prong requires Upper Deck to show both "'copying' and 'unlawful appropriation.'" *Skidmore*, 952 F.3d at 1064. The Court first considers whether there was

unlawful appropriation, which is dispositive here.  To determine whether there is "unlawful appropriation," courts in the Ninth Circuit employ a two-part test: (1) the extrinsic test; and (2) the intrinsic test.  *Id.*  The two-part analysis allows courts to "distinguish between permissible lifting of ideas and impermissible copying of expression."  *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 913 (9th Cir. 2010).  To succeed on its copyright claim, Upper Deck must satisfy both tests.  *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006).

> 1. <u>Lorcana does not infringe Rush of Ikorr.</u>

Upper Deck alleges that two categories of elements of Lorcana are substantially similar to elements in Rush of Ikorr: (1) "Characters" (Lorcana) and "Creatures/Champions" (Rush of Ikorr) and (2) "expressive game effects."  Dkt. No. 83 at ¶¶77(a)–(b).  As to "Characters" and "Creatures/Champions," Upper Deck identifies the following alleged similarities in the two games:

> (1) a character that can only be challenged by characters of the same type (called "Evasive" in Lorcana, "Elusive" in Rush of Ikorr);
>
> (2) a character that adds to the strength of another character during a turn (called "Support" in both);
>
> (3) a character that must be challenged (Lorcana) or attacked (Rush of Ikorr) before other characters (called "Bodyguard" in Lorcana, "Defender f/k/a Bodyguard" in Rush of Ikorr); and
>
> (4) a character that can challenge (Lorcana) or attack (Rush of Ikorr) in the same turn it is played (called "Rush" in Lorcana, "Charge or Sneak Attack" in Rush of Ikorr).

*Id.* ¶ 77(a).  As to expressive game effects, Upper Deck points to:

> (1) both games requiring players build card decks from only two colors of cards and "loyal" cards affecting deck-building;
>
> (2) identical point-scoring systems which require characters to "exhaust[,] which is the only time they can be attacked";
>
> (3) a card whose effect, when played, is to destroy the character that challenges or attacks it; and

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 9

1

(4) "a standalone pseudo-discard pile where players accumulate resources needed to bring cards into play and which remains permanent."

2

Dkt. No. 83 ¶ 77(b).

3

       a.     *Upper Deck fails to satisfy the extrinsic test.*

4

Part one, the extrinsic test, is an objective one, and "focuses on articulable similarities

5

between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events."

6

*Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (quoting *Kouf v. Walt Disney*

7

*Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)). The extrinsic test requires a threshold

8

determination as to whether the similar elements are protectable or unprotectable. *Mattel*, 616

9

F.3d at 913. "[I]deas, scenes a faire (standard features)[,] and unoriginal components aren't

10

protectable." *Id.* "When the unprotectable elements are 'filtered' out, what's left is an author's

11

particular expression of an idea," which is protectable. *Id.* Because it is objective, the extrinsic

12

test is "often resolved as a matter of law." *Gray v. Hudson*, 28 F.4th 87, 97 (9th Cir. 2022). In

13

applying the extrinsic test, "[a] court must take care to inquire only whether 'the *protectible*

14

*elements, standing alone*, are substantially similar.'" *Cavalier*, 297 F.3d at 822 (quoting *Williams*

15

*v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)). If the court determines that the plaintiff has failed

16

to satisfy the extrinsic test, the infringement claim fails, and there is no need to proceed to the

17

intrinsic test. *Corbello v. Valli*, 974 F.3d 965, 974 (9th Cir. 2020). "The extrinsic test thus serves

18

to screen out objectively meritless claims, so courts can apply it as a matter of law." *Tangle, Inc.*

19

*v. Aritzia, Inc.*, 125 F.4th 991, 997 (9th Cir. 2025).

20

At this stage, courts also determine the standard for infringement: "substantially similar or

21

virtually identical." *Mattel*, 616 F.3d at 914. Where there is a wide range of expression for a

22

particular work, "copyright protection is 'broad' and a work will infringe if it's 'substantially

23

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 10

similar' to the copyrighted work." *Id.* at 913–14. Where there is "a narrow range of expression … copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Id.* at 914.

The threshold issue is which components of Version 2.6, if any, are protectable. As a general rule, copyright law does not protect "any idea, procedure, process, system, method of operation, concept, or discovery." 17 U.S.C. § 102(b). The Copyright Office has explained that, as applied to games:

> [C]opyright does not protect the idea for a game, its name or title, or the method or methods for playing it. Nor does copyright protect any idea, system, method, device, or trademark material involved in developing, merchandising, or playing a game. Once a game has been made public, nothing in the copyright law prevents others from developing another game based on similar principles. Copyright protects only the particular manner of an author's expression in literary or artistic elements that the work may contain.

U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 714 (2021) (citing 17 U.S.C. § 102(b)). Courts, too, have recognized that "game mechanics and the rules are not entitled to protection[.]" *Tetris Holding, LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 404 (D.N.J. 2012). By contrast, courts that have found copyright protection for aspects of games have focused on "literary" or "artistic" elements and found expressive aspects in a game's well-developed characters that generate protectable game progression. *See DaVinci Editrice S.R.L. v. ZiKo Games, LLC*, 183 F. Supp. 3d 820, 834 (S.D. Tex. 2016) (discussing cases).

Defendants argue that Version 2.6 is comprised almost entirely of unprotectable ideas, procedures, and methods of operation. Dkt. No. 122 at 27. To the extent any of Version 2.6 is subject to copyright protection, Defendants argue that any such protection would be limited to the actual text used to convey the game's mechanics, including the instructions and the words on the cards, but not the game mechanics themselves. Dkt. No. 122 at 36. Upper Deck counters that, taken together, the "abstract ideas" in Version 2.6 create a "bundle of particular expressions" that merit copyright protection, and urges the Court to look at the "combination of plot, narrative,

character, pace, etc." of Version 2.6.  Dkt. No. 148 at 18–19.  At oral argument, Upper Deck pointed to *Atari v. North American Philips Consumer Electronics* as its best case in support of the proposition that certain game mechanics can be expressive, and thus, protectable.  672 F.2d 607 (7th Cir. 1982).

In *Atari*, the Seventh Circuit found that certain mechanical aspects of PAC-MAN— including the wrap-around maze, scoring table, tunnel exits, and game mechanic whereby players chase dots around the maze to earn points were "standard game devices" that receive thin protection "only from virtually identical copying."[4]  *Id.* at 617.  In contrast, the court found protectable expression in PAC-MAN's uniquely designed main characters of a "gobbler" and antagonist "ghost monsters" because they "distinguishe[d] PAC-MAN from conceptually similar video games," and were "wholly fanciful creations, without reference to the real world."  *Id.* at 617–18.  To support its claim that game mechanics can constitute protectible expression, Upper Deck cites the *Atari* discussion of PAC-MAN's "role reversal and 'regeneration' process."  672 F.2d at 618.  While Upper Deck is correct that the *Atari* court found certain elements of the game mechanics protectible, the court described the "expression" of those features in terms of the creative game characters and narrative that accompanies the mechanics:

> When the gobbler consumes one of the power capsules, the vulnerable monsters turn purple and reverse direction, moving at a slightly slower speed. If caught by the gobbler, a monster 'vanishes': its body disappears and only white 'eyes' and 'feet' remain to indicate its presence. Instead of returning directly to the corral to regenerate, the ghost-like figure continues to wander about the maze, but does not affect the play.  Only if the rotating corral happens to open up toward the monster as it travels one of the adjacent passageways will the monster re-enter the corral to be regenerated.  This delay in regeneration allows the gobbler more time to clear the maze of dots. When the period of vulnerability is about to end, each monster flashes its original color as a warning.

---

[4] It is unlikely the Ninth Circuit would agree that such standard game elements receive any protection at all.  *Mattel*, 616 F.3d at 913 ("For example, ideas, scenes a faire (standard features) and unoriginal components aren't protectable.").

1    *Id.* at 612.

2        Version 2.6 lacks the type of narrative, expressive characters or "fanciful creations,"

3    identified by the *Atari* court.  And Version 2.6's game features—which include an outline of rules,

4    including allegedly infringed card types and abilities, as well as draft card decks with no artwork—

5    are not original.  As Defendants point out, the allegedly infringed abilities are common to other

6    TCGs that pre-date Rush of Ikorr.  *See* Dkt. No. 122 at 19–22 (pointing to TCGs from 2018 and

7    2020 that contain allegedly infringing card abilities); Dkt. No. 122 at 34 ("[u]sing resources (like

8    'mana' or 'influence') to play cards … is a mechanic in Magic, Duel Masters, Hearthstone

9    BattleTech, World of Warcraft, and Hecatomb.").  "Even if the [] characters' abilities were not

10   stock, they are still not expressive because they are essentially rules of game play," and moreover,

11   such abilities are "neither literary nor artistic." *DaVinci*, 183 F. Supp. at 834 (granting summary

12   judgment in favor of defendants where card games featured nearly identical rules and abilities but

13   distinct expressive elements: Wild West and Ancient Chinese-inspired artwork and themes,

14   respectively).  *Atari* thus does not support finding protectible expression in Version 2.6.

15       Upper Deck also cites *Spry Fox v. LOLApps* for the proposition that game progressions are

16   protectable because they are "analogous to 'a literary work like a novel or a screenplay,' with

17   'measurable objective elements that constitute [their] expression includ[ing] the plot, theme,

18   dialogue, mood, setting, pace, characters, and sequence of events.'"  Dkt. No. 148 at 18 (citing

19   *Spry Fox LLC v. LOLApps Inc.*, No. 12-cv-00147, 2012 WL 5290158, at *5 (W.D. Wash. Sep. 18,

20   2012)).  But *Spry Fox* is inapposite to the factual record here.  First, *Spry Fox* was decided on a

21   motion to dismiss.  2012 WL 5290158, at *1.  In that context, the court determined only that Spry

22   Fox plausibly alleged facts sufficient to pass the extrinsic test—and it is "generally disfavored for

23   copyright claims to be dismissed for lack of substantial similarity at the pleading stage." *Tangle*,

24   125 F.4th at 997.  Moreover, the *Spry Fox* court explained that Spry Fox sufficiently pled copyright

infringement where its game progression included particular characters—a bear and a bot—progressing through particular locations—"from grass to bushes to trees to houses and beyond"—where all of these elements were placed within a particular meadow. *Spry Fox*, 2012 WL 5290158, at *5. Further, Spry Fox "chose its own visual depiction of each of those objects." *Id.* And while the bear's and bot's movements through specific locations were protectable, the video game's mechanics and rules were not because they were "scenes a faire in many video games (and often in games in general)." *Id.* at *5–6 (describing unprotectable features such as the game's use of coins to mark player progress, the display of visual guidance in the margins of the game screen, the use of an in-game marketplace, and the use of a six-by-six game grid). Again, Version 2.6 lacks any sort of expressive elements similar to the ones alleged in *Spry Fox*.

Even assuming that Version 2.6 contained protectable elements, analysis under the extrinsic test yields little in the way of similarity between Version 2.6 and Lorcana. The extrinsic test directs the Court to find "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Cavalier*, 297 F.3d at 822. But Version 2.6 does not contain the type of artistic expression vis-à-vis plot, themes, mood, setting, characters, particular artwork, or sequence that copyright law aims to protect. And while Rush of Ikorr in its current form certainly includes themes, mood, and characters, those elements could not be more different than the ones in Lorcana. Upper Deck argues that the games are "fundamentally identical in nature based on the sufficient overlap as a bundle of particular expressions of abstract ideas." Dkt. 148 at 18. But calling unprotectable game mechanics that are standard in TCGs "expressions" does not make them so, and ideas are expressly not protected by copyright law. 17 U.S.C. § 102(b).

Thus, Upper Deck's argument that the Version 2.6 game rules and mechanics are protectable as "bundles of expression" fails. Unlike both *Atari* and *Spry Fox*, Version 2.6 has no creative characters, narrative, plot, or themes to render expressive its non-protectable elements.

Accordingly, after filtering out unprotectable elements—here, the game's rules and mechanics set forth in a two-page outline (Dkt. No. 132 at 4–5), and additional mechanics delineated in the sample cards (Dkt. No. 132 at 6–37)—there is nothing for the Court to analyze except particular word choices.

Because there are only so many ways to describe common game mechanics, however, thin protection applies to the word choices used in Version 2.6.  *See Spry Fox*, 2012 WL 5290158, at *5 (language used in video game dialogue boxes subject to thin copyright protection because game mechanics could not be expressed in a wide variety of ways); *see also Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994) (thin protection against virtually identical copying applied where there were limited ways to express a computer's user interface).  The record amply reflects the limits inherent in expressing TCG mechanisms.  For example, Version 2.6 uses the term "Poison" to describe a card ability that destroys challengers.  Dkt. No. 132 at 5.  The ability is similar to one called "Poison" in a TCG released in 2018, and another called "Poisonous" in a different TCG released in 2020.  Dkt. No. 122 at 37.  Further illustrating this principle, TCG designers who worked on Rush of Ikorr after Miller's departure explained that the Version 2.6 "Elusive" ability exists "in many TCGs" including Legends of Runeterra.  Dkt. No. 179 at 101, 147–48.  Thus, the "virtually identical" standard applies.  *Mattel*, 616 F.3d at 914.

Lorcana's word choices are not virtually identical to Version 2.6's word choices.  *See* Dkt. No. 122 at 37.  First, Lorcana card characters have different names than Version 2.6 creatures.  *Compare* Dkt. No. 182 at 269 (Lorcana TCG characters named "Jafar – Wicked Sorcerer" and "Pongo – Ol' Rascal") *with* Dkt. No. 123 at 28 (Version 2.6 creatures called "Black Dragon" and "Devil").  Second, Lorcana largely uses different words to describe card abilities.  As to the "Poison" ability in Version 2.6, Lorcana cards that feature a similar ability do not use the word "poison" or "poisonous" at all.  *See* Dkt. No. 122 at 19–20 ("Cheshire Cat – Not All There" card

describing a similar ability, but using a different description that lacks reference to "poison").  In addition, the "Elusive" ability that Upper Deck argues supports finding infringement is described using the word "Evasive" in Lorcana, and, unlike Version 2.6, Lorcana describes the ability in terms of particular card characters.  *See* Dkt. No. 182 at 269 (explaining that one Evasive character, "Pongo – Ol' Rascal[,]" can only be challenged by other Evasive characters).  The only general card ability in Lorcana that uses the exact same label as a Version 2.6 card is "Bodyguard," but as Defendants point out, there are limited ways to express that concept.  Dkt. No. 122 at 36.  And as TCG designer Luke Peterschmidt acknowledged, other TCGs besides Rush of Ikorr and Lorcana also have the same "bodyguard" ability.  Dkt. No. 182 at 43–44.  Moreover, "[w]ords and short phrases" are not subject to copyright.  37 C.F.R. § 202.1(a).  A single card with the same name does not raise a triable issue of fact on Upper Deck's copyright claim.

In summary, though the games are somewhat similar, "there is no more than the similarity that must unavoidably be produced by anyone who wishes to use and restate the unprotectable ideas contained" in Rush of Ikorr and pre-existing TCGs.  *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 489 (9th Cir. 1984).  Thus, Upper Deck's copyright claim fails the extrinsic test and therefore fails as a matter of law.  *See Kouf*, 16 F.3d at 1045 ("[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests.").  And, even if the intrinsic test went to a jury, as explained above, virtual identity is the appropriate standard in this case.  Given that Upper Deck has not shown virtual identity between the text used in Version 2.6 and Lorcana, no reasonable juror could find infringement under the intrinsic test.

2.  Upper Deck's intermediate copying theory fails.

In its opposition to Ravensburger's motion, Upper Deck raises the theory of intermediate copying to support its infringement claim.  Dkt. No. 148 at 26–27.  Under its intermediate copying

theory, Upper Deck argues that Miller copied Version 2.6 in a "transient or preparatory" manner, and such transient copying led to the development of the Lorcana TCG.  *Id.*  The theory of "intermediate copying" stems from the text of the Copyright Act, which grants a copyright owner the exclusive rights "to reproduce the work in copies[,]" "to prepare derivative works based upon the copyrighted work[,]" and to authorize the preparation of copies and derivative works.  17 U.S.C. § 106(1)–(2).  "[T]he Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent."  *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992) (citing *Walker v. Univ. Books*, 602 F.2d 859, 864 (9th Cir. 1979)).  "[T]he fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement."  *Walker*, 602 F.2d at 864.

Plaintiff's intermediate copying theory fails for two reasons.  First, as Defendants point out, Upper Deck failed to introduce evidence of Miller's direct lifting of Version 2.6 into the Lorcana game.  *See Sega*, 977 F.2d at 1516, 1518–19 (leaving open the possibility of infringement based on intermediate copying theory where there was evidence of direct copying of disassembled computer code).  Second, the "intermediate copying" theory cannot be leveraged to create protection for ideas or functions, which are "aspects that were expressly denied copyright protection by Congress."  *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 605 (9th Cir. 2000) (citing *Sega,* 977 F.2d at 1526).  In other words, the intermediate copying theory also fails because Upper Deck has not shown Miller or Ravensburger copied any expressive work.  "If [Plaintiff] wishes to obtain a lawful monopoly on the functional concepts in its [product], it must satisfy the more stringent standards of the patent laws."  *Sony Comput.*, 203 F.3d at 605.

In sum, Defendants' motion is granted on Upper Deck's copyright infringement claim.

1

2

**B.      Disputed Facts Preclude Summary Judgment on Upper Deck's Breach of Contract Claim Against Miller.**

Upper Deck alleges that Miller breached both the 2018 and 2019 Agreements by "copying Upper Deck's proprietary and novel TCG game and disclosing the central, proprietary components and expressions within the game to Upper Deck's direct competitor, Ravensburger, to develop the Lorcana trading card game." Dkt. No. 83 ¶ 58.  Miller admits discussing Rush of Ikorr mechanics with third parties on at least three occasions while still subject to the Agreements but argues that any disclosures did not breach the Agreements because: 1) any material disclosed was not confidential; 2) the disclosures were made for the benefit of Upper Deck; and 3) the Agreements as construed by Upper Deck would be invalid under California law.  As detailed below, issues of fact preclude summary judgment for Miller on this claim.

1.   Factual issues regarding the nature of the disclosures preclude summary judgment.

Although copyright affords no protection to ideas, "[e]xpress contracts are capable of providing the broadest protection."  5 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, §19D.05[A][1] (2025).  A holding of no copyright infringement does not preclude a finding of breach of contract.  *See Benay v. Warner Bros. Ent.*, 607 F.3d 620, 629–32 (9th Cir. 2010).  "Similar to the inference of copying in copyright law, California contract law[5] 'permits actual use of a plaintiff's idea to be inferred from evidence of access and similarity….'"  *Id.* at 630 (citing 4 Nimmer § 19D.07[C]).  In the related area of trade secret misappropriation, courts have observed that plaintiffs can rarely prove misappropriation with direct evidence.  Rather, "[i]n most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which

---

[5] The Court previously explained that California law applies to the state law claims.  *See* Dkt. No. 58 at 3–4.

the trier of fact may draw inferences." *Greenberg v. Croydon Plastics Co., Inc.*, 378 F. Supp. 806, 814 (E.D. Pa. 1974).

Focusing on the "Confidentiality" provision in the 2019 Agreement, Miller argues that the Agreements only prohibit Miller from disclosing "Confidential Information" which does not include any information that "is or becomes publicly known" through no fault of Miller's. Dkt. No. 122 at 38; Dkt. No. 179 at 66. In Miller's view, the common game mechanics used in Version 2.6 cannot be "confidential" or "proprietary," and thus, there was no breach. Dkt. No. 122 at 34; Dkt. No. 157 at 18. Upper Deck responds that there is both direct evidence of Miller discussing confidential aspects of Rush of Ikorr, as well as circumstantial evidence that Miller appropriated and used confidential Upper Deck intellectual property: namely, Miller had access to such information and Lorcana became more like Rush of Ikorr after he joined Ravensburger. Dkt. No. 148 at 31–35.

Miller is correct that the 2019 Agreement excludes from "Confidential Information" any information made publicly known. And while common game mechanics included in Version 2.6, on their own, would have been publicly known and thus excluded from the nondisclosure provision, Miller does not argue that the entire set of rules and card layouts in Version 2.6 were publicly known. The 2019 Agreement broadly defines "Confidential Information" to include general "products," "plans," and "techniques," among other things. Dkt. No. 179 at 65–66. And as explained above, protection afforded through contract can be broad: parties may agree to protection of ideas "no matter how slight or commonplace[.]" *Weitzenkorn v. Lesser*, 256 P.2d 947, 958 (Cal. 1953). Thus, the 2019 Agreement could be construed as prohibiting disclosure of the entire "product" of Version 2.6, including its non-public combination of game mechanics, as well as the fact that Upper Deck was developing a TCG with particular features. Construing the facts in Upper Deck's favor as the Court must, Miller cannot secure summary judgment on the

breach of contract claim simply because many of the individual game mechanics used in Version 2.6 were commonly known at the time.

On the record here, a reasonable jury could find that Miller disclosed "Confidential Information" about Version 2.6.  Indeed, Miller does not dispute that he had access to Upper Deck's confidential information and that he discussed the unique "Overlay" concept from Rush of Ikorr with Steve Warner while Warner was working on Lorcana.  Dkt. No. 159 at 132.  He has admitted to doing contract work for both Ravensburger and Upper Deck, including work on both Rush of Ikorr and Lorcana, at the same time.  Dkt. No. 182 at 89–95.  Miller also admits he maintained a copy of the Version 2.6 rules, as well as digital copies of the cards, while he helped develop Lorcana.  *Id.* at 60–61.  While Miller argues that Upper Deck never asked him to destroy the copies maintained on his own computer, he does not dispute that such material became "property" of Upper Deck under the Agreements.

Upper Deck also argues that the progression of the Lorcana game to "becom[e] more like Rush of Ikorr" after Miller joined Ravensburger suggests Miller disclosed information about Version 2.6 in breach of the 2019 Agreement.  Dkt. No. 148 at 35.  Miller responds that "even accepting that contention as true for summary judgment, Upper Deck has not shown that the changes suggest the *disclosure or use of confidential or proprietary information.*"  Dkt. No. 157 at 23–24 (arguing that nothing in Version 2.6 can be construed as "confidential" or "proprietary" given that many of the abilities and effects used in Version 2.6 were common TCG features at the time).  But where the parties have entered into an express contract and there are allegations of impermissible copying, such cases "present questions of fact for the jury as to the terms of the contract, access, similarity, and copying."  *Weitzenkorn*, 256 P.2d at 958.

1

2. <u>Factual disputes regarding contract damages prevent summary judgment.</u>

2

Miller argues that his conversations with other game designers about Rush of Ikorr

3

elements "were for Upper Deck's benefit" and that "Miller was simply kicking the tires on the

4

idea[.]"  Dkt. No. 122 at 39.  To the extent that this contention goes to damages, it does not defeat

5

Upper Deck's contract claim because California law permits a plaintiff to recover nominal

6

damages for breach of contract.  *See* Cal. Civ. Code § 3360 ("When a breach of duty has caused

7

no appreciable detriment to the party affected, he may yet recover nominal damages.").[6]  And

8

while a jury may conclude that Miller's disclosures ultimately caused no harm to Upper Deck, his

9

characterization of his conversations with other designers only presents additional issues for the

10

jury on damages.

11

3. <u>The Agreements are not invalid under California Law.</u>

12

Finally, Miller argues that, to the extent the Agreements barred him from reusing common

13

game mechanics, they are void under California law.  California law provides that "every contract

14

by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind

15

is to that extent void."  Cal. Bus. & Prof. Code § 16600.  Defendants point to *Brown v. TGS Mgmt.*

16

*Co.* (Cal. 2020), which held that broad confidentiality provisions that "plainly bar[red] [Plaintiff]

17

in perpetuity from doing any work in the securities field," were unenforceable because they

18

"operate[d] as a de facto noncompete provision" in violation of Section 16600.  57 Cal. App. 5th

19

303, 319.  The Court rejects this argument.  The confidentiality clause in the Agreements—which

20

provides that workers must not disclose confidential information for a period of two years

21

following termination—is nowhere near as sweeping as the total noncompete in *Brown*.  As noted

22

23

24

[6]At oral argument, Upper Deck conceded that its copyright damages expert would not opine as to contractual damages.

earlier, the Agreements did prohibit Miller from using publicly known information—including the individual, commonly used game mechanics in Version 2.6—in his other projects.

In summary, because there are triable issues as to whether Miller disclosed "Confidential Information" in breach of the Agreements and whether any alleged breach caused damage to Upper Deck, the Court declines to grant summary judgment on the breach of contract claim.

**C.    The Conversion Claim Against Ravensburger is Dismissed.**

At oral argument, Upper Deck conceded that the Copyright Act preempts its state law conversion claim, but reserved the right to take the issue up with the Ninth Circuit. Thus, the Court grants Defendants' motion for summary judgment as to conversion against Ravensburger.

**D.    Defendants' Motion is Granted as to the Fraud Claim Against Miller.**

When Miller left Upper Deck, he told them he was going to work at Ravensburger because he had been offered a full-time job with benefits, which he wanted. Upper Deck argues that Miller failed to disclose the real reason for leaving Upper Deck—specifically his intention to work on a TCG at Ravensburger. Upper Deck argues this lack of disclosure supports both a fraudulent misrepresentation and a fraudulent concealment claim. Dkt. No. 148 at 39.

Miller counters that his disclosure to Upper Deck—that he sought full-time employment with benefits—was true. However, as to fraudulent misrepresentation, Miller argues that his failure to disclose his work on a different TCG did not render his disclosure false. Dkt. No. 122 at 45. As to fraudulent concealment, Miller asserts he had no duty to disclose that he planned to work on another TCG. *Id.* at 47–48. For the reasons explained below, Upper Deck fails to raise an issue of material fact as to either fraud claim.

1       1. <u>Upper Deck fails to raise triable issues as to falsity, so the fraudulent</u>

2       <u>misrepresentation claim is dismissed.</u>

3       In California, a claim for fraudulent misrepresentation requires, among other things, a false

4   representation. *Thomas v. Regents of Univ. of California*, 97 Cal. App. 5th 587, 637 (Cal. Ct. App.

5   2023), *reh'g denied* (Dec. 29, 2023), *review denied* (Feb. 28, 2024) (citation modified).

6       Defendants argue that there was no false representation made to Upper Deck because

7   Miller's statement that he decided to terminate the 2019 Agreement to seek stable employment

8   with benefits was true. Dkt. No. 122 at 44–45. Upper Deck suggests that Miller's failure to

9   disclose that he planned to design a TCG for a competitor renders his statement to Upper Deck a

10  "half-truth." Dkt. No. 148 at 39. But Upper Deck nevertheless acknowledges that Miller may

11  have truly sought better benefits. *Id.* at 39. Upper Deck points to Miller's statements that he is a

12  "Disney fan" and that he was "excited about working on a Disney game," to support that Miller

13  hid his "primary motive" for leaving Upper Deck. *Id.* at 39; Dkt. No. 182 at 94. Fatally to its

14  claim, Upper Deck fails to explain why non-disclosure of Miller's intent to design a TCG for

15  another company or Miller's excitement to work on a Disney game renders his statement to Upper

16  Deck about seeking better benefits false. On the contrary, Upper Deck admits "it is probably true"

17  that Miller sought full-time employment with benefits. Dkt. No. 148 at 38. In short, the record

18  does not reflect a false representation.

19      Accordingly, the Court grants summary judgment as to fraudulent misrepresentation.

20      2. <u>The fraudulent concealment claim is dismissed.</u>

21      As to fraudulent concealment, Upper Deck argues that Miller concealed his "true reason"

22  for leaving, that he was leaving to work with a competitor designing a "near-identical TCG." Dkt.

23  No. 148 at 41. Upper Deck also takes issue with Miller's failure to disclose that he worked on

24

Lorcana and Rush of Ikorr simultaneously. *Id.* at 40. To prevail on a claim for fraudulent concealment, Upper Deck must establish each of the following elements:

> (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact.

*Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 605–06 (Cal. Ct. App. 2014) (quoting *Perlas v. GMAC Mortg., LLC*, 187 Cal. App. 4th 429, 434 (Cal. Ct. App. 2010)).

Upper Deck argues that Miller had a duty to disclose "the real and full reasoning for his departure … because [he] volunteered some purported reasoning." Dkt. No. 148 at 41. Defendants argue that Miller had no duty to disclose "everything" about future employment plans to Upper Deck. Dkt. No. 122 at 47.[7] This Court previously explained that where one decides to speak, he "is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated." Dkt. No. 58 at 12 (quoting *Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 613 (Cal. Ct. App. 1992)).

The Court's prior assessment of the applicable duty was based upon the allegations in the complaint. But since the Court's ruling on the motion to dismiss, the parties have engaged in extensive discovery. The record now before the Court clarifies the nature of the relationships

---

[7] Defendants argue that the Court should not find Miller had a duty to disclose that he was going to work on another TCG because doing so would impose "double-liability" on Miller. Dkt. No. 122 at 48 (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 338 (Cal. 1997)). In *LiMandri*, a plaintiff brought separate causes of action for intentional interference with prospective economic advantage and non-disclosure against an attorney for misrepresenting superiority of lien rights. 52 Cal. App. 4th at 334–35. As to non-disclosure, in dicta, the *LiMandri* court noted that finding defendant had a duty to disclose his intent to breach or infringe upon Upper Deck's copyright. Instead, Upper Deck failing to disclose his intention to wrongfully assert the superiority of [] lien rights," and wrongful assertion of superior lien rights was "the basis for [the] cause of action." *Id.* at 338. But here, Upper Deck does not argue that Miller should have disclosed his intent to breach his contract or infringe upon Upper Deck's copyright. Instead, Upper Deck contends that Miller should have disclosed the full reasoning for his departure, namely, his intent to work on a competitor's TCG. Dkt. No. 148 at 39. Because Upper Deck does not argue Miller must have disclosed his intent to commit any act that independently imposes liability on Miller, Defendant's double-liability theory fails.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 24

between Miller and Upper Deck, and Miller and Ravensburger.  It has also clarified industry customs around TCG freelance work as applied to Miller in particular.  As previously discussed, Miller simultaneously worked as a freelance "contract for hire" for Upper Deck and Ravensburger. Dkt. No. 179 at 25.  And Miller explained that it is "very common" for TCG freelancers to work on game design for multiple companies at a time to earn sufficient income.  Dkt. No. 179 at 24. Indeed, the 2019 Agreement did not bar Miller from working for other companies simultaneously, and Upper Deck expected that he would do just that.  *See* Dkt. No. 179 at 62–71; Dkt. No. 159 at 146–47.

The Court thus concludes that even if Upper Deck was correct that Miller's true intent in accepting the position at Ravensburger was to work on a different TCG, this does nothing to "materially qualify" his statement that he intended to depart to seek better benefits, especially in the context of Miller's status as a freelance game designer not subject to a non-compete agreement. Because of the nature of TCG freelance work and Miller's then-status as a freelancer for both Upper Deck and Ravensburger, Miller had no duty to disclose to Upper Deck that he planned to work on a TCG for Ravensburger.  Upper Deck thus fails to show that Miller concealed a material fact he was obligated to disclose.

Moreover, even if Upper Deck could make such a showing, the claim would still fail because Upper Deck cannot show Miller intended to defraud.  Upper Deck contends that there are "triable issues regarding Miller *intentionally* offer[ing] only half truths."  Dkt. No. 148 at 42. While it is "not unusual" to establish intent through circumstantial evidence, an inference of intent must not be "based on speculation or conjecture."  *RSB Vineyards, LLC v. Orsi*, 15 Cal. App. 5th 1089, 1097–98 (Cal. App. 2017).  Here, there are no facts in the record, even circumstantial, that show Miller intended to defraud Upper Deck by not disclosing that he would work on another TCG for Ravensburger.

Finally, in the context of Miller's status as a freelance contractor not subject to a non-compete agreement, Upper Deck either knew or should have known that Miller could work on other TCGs and that his future employment could involve TCG design, undermining the fourth element of fraudulent concealment, that plaintiff "was unaware" of the concealed fact. As Miller points out, Upper Deck sought him out "because of his experience with TCGs." Dkt. No. 122 at 49. Upper Deck's Senior Director of Game Development acknowledged that, under Upper Deck's freelance terms, Miller could work as a game designer for other companies, and that there is no prohibition against freelancers designing other games. Dkt. No. 159 at 146–47. He further acknowledged that he has seen game designers work on multiple games at the same time. *Id.* at 147. And as explained above, it is common for game design freelancers to work on multiple projects simultaneously given the pay scale of contract for hire work.

Thus, Upper Deck fails to raise triable issues as to multiple elements of fraudulent concealment, and the Court grants summary judgment on this claim.

**E.    The Unfair Competition Law Claim Against Miller and Ravensburger is Dismissed.**

California's unfair competition law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (Cal. Bus. & Prof. Code § 17500 et seq.)]." Cal. Bus. & Prof. Code § 17200. The statute "establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)). The Court previously allowed Upper Deck's UCL claim to proceed under the "unlawful" prong because California's UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." Dkt. No. 79 at 11 (quoting *Cel-Tech Commc'ns*, 20 Cal. 4th at 180). The Court reasoned that Upper Deck's UCL claim could "borrow" the alleged conversion and fraud claims

against Ravensburger and Miller, respectively. *Id.* at 12. But because the Court grants summary judgment as to both conversion and fraud, the Court also grants summary judgment as to Upper Deck's UCL claim against both Defendants.

## IV. CONCLUSION

For the reasons detailed above, the Court:

GRANTS Defendants' motion for summary judgment as to copyright infringement, conversion, fraudulent misrepresentation, fraudulent concealment, and UCL, and dismisses all claims against Defendant Ravensburger; and

DENIES Defendants' motion for summary judgment as to breach of contract.

The Court notes that the pending motions to exclude expert witnesses (Dkt. Nos. 116, 175, 177) were briefed in the context of a copyright infringement claim. Now that the copyright infringement claim has been dismissed, the Court ORDERS the parties to file a joint status report by October 8, 2025, summarizing which motions to exclude, if any, remain at issue.

Dated this 3rd day of October, 2025.

Kymberly K. Evanson
United States District Judge